QUINN EMANUEL URQUHART & SULLIVAN, LLP
  Shon Morgan (Bar No. 187736)
  (shonmorgan@quinnemanuel.com)
  John W. Baumann (Bar No. 288881)
  (jackbaumann@quinnemanuel.com)
865 South Figueroa Street, 10th Floor
Los Angeles, California  90017
Telephone:     (213) 443-3000
Facsimile:     (213) 443-3100

  Cristina Henriquez (Bar No. 317445)
  (cristinahenriquez@quinnemanuel.com)
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, California 94065
Telephone:     (650) 801-5000
Facsimile:     (650) 801-5000

Attorneys for ANCESTRY.COM OPERATIONS
INC., ANCESTRY.COM INC., and
ANCESTRY.COM LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| MEREDITH CALLAHAN and LAWRENCE GEOFFREY ABRAHAM, on behalf of themselves and all others similarly situated,<br><br>                 Plaintiffs,<br><br>          vs.<br><br>ANCESTRY.COM OPERATIONS INC., a Virginia Corporation; ANCESTRY.COM, INC., a Delaware Corporation; ANCESTRY.COM LLC, a Delaware Limited Liability Company; and DOES 1 through 50, inclusive,<br><br>                 Defendants. | CASE NO. 3:20-cv-08437-LB<br><br>**REPLY IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS PURSUANT TO FRCP 12 AND MOTION TO STRIKE PURSUANT TO CALIFORNIA CODE OF CIVIL PROCEDURE § 425.16;**<br><br><br>Hearing Date: February 18, 2021<br>Hearing Time: 9:30 a.m.<br>Location: San Francisco Courthouse, Courtroom B |

# **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ....................................................................................1

ARGUMENT ..............................................................................................................1

I.     PLAINTIFFS HAVE NOT ALLEGED A COGNIZABLE INJURY ..................................1

II.    THE "PUBLIC AFFAIRS" EXCEPTION APPLIES ........................................................6

III.   SECTION 230 OF THE CDA BARS ALL PLAINTIFFS' CLAIMS....................................8

IV.    PLAINTIFFS' CLAIMS ARE PREEMPTED BY THE COPYRIGHT ACT....................11

V.     NO PLAUSIBLE CLAIM EXISTS FOR INTRUSION UPON SECLUSION ..................12

VI.    PLAINTIFFS' UNJUST ENRICHMENT CLAIM FAILS .................................................13

VII.   PLAINTIFFS ARE NOT ENTITLED TO STATUTORY DAMAGES ...........................14

VIII.  CALIFORNIA'S ANTI-SLAPP STATUTE APPLIES......................................................14

1

**TABLE OF AUTHORITIES**

2

**Page**

3

**Cases**

4   *Abdul-Jabbar v. General Motors Corporation,*
          85 F.3d 407 (9th Cir. 1996) ............................................................................. 7

5

    *Atl. Recording Corp. v. Project Playlist, Inc.,*
6         603 F. Supp. 2d 690 (S.D.N.Y. 2009) ............................................................ 10

7   *Beck v. McDonald,*
          848 F.3d 262 (4th Cir. 2017) ............................................................................ 5

8

9   *Blackburn v. ABC Legal Servs., Inc.,*
          2011 WL 8609453 (N.D. Cal. June 16, 2011) ............................................... 15

10  *Carafano v. Metrosplash.com, Inc.,*
          339 F.3d 1119 (9th Cir. 2003) ........................................................................... 9

11

12  *Club Members for an Honest Election v. Sierra Club,*
          45 Cal. 4th 309 (2008) ...................................................................................... 15

13  *Cohen v. Facebook, Inc.,*
          798 F. Supp. 2d 1090 (N.D. Cal. 2011) ......................................................... 1, 4

14

15  *Davis v. Facebook, Inc.,*
          956 F.3d 589 (9th Cir. 2020) .......................................................................... 2, 4

16  *Dora v. Frontline Video, Inc.,*
          15 Cal. App. 4th 536 (1993) ............................................................................ 14

17

18  *Downing v. Abercrombie & Fitch,*
          265 F.3d 994 (9th Cir. 2001) ........................................................................... 12

19  *Dziubla v. Piazza,*
          59 Cal. App. 5th 140 (2020) ............................................................................ 15

20

21  *ESG Capital Partners, LP v. Stratos,*
          828 F.3d 1023 (9th Cir. 2016) ......................................................................... 13

22  *Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC,*
          521 F.3d 1157 (9th Cir. 2008) ......................................................................... 10

23

24  *FilmOn.com Inc. v. DoubleVerify Inc.,*
          7 Cal. 5th 133 (2019) ....................................................................................... 15

25  *Fleet v. CBS, Inc.,*
          50 Cal. App. 4th 1911 (1996) .......................................................................... 11

26

27  *Fraley v. Facebook, Inc.,*
          830 F. Supp. 2d 785 (N.D. Cal. 2011) ...................................................... passim

28

*Gill v. Curtis Publ'g Co.,*
    38 Cal. 2d 273 (1952) ............................................................................................. 7

*Gill v. Hearst Pub. Co.,*
    40 Cal. 2d 224 (1953) ............................................................................................. 7

*Goddard v. Google, Inc.,*
    640 F. Supp. 2d 1193 (N.D. Cal. 2009) ................................................................. 9

*Guglielmi v. Spelling–Goldberg Productions,*
    25 Cal. 3d 860 (1979) ........................................................................................... 15

*In re Facebook, Inc., Consumer Privacy User Profile Litig.,*
    402 F. Supp. 3d 767 (N.D. Cal. 2019) ............................................................ 12, 13

*In re Google, Inc. Privacy Policy Litig.,*
    2013 WL 6248499 (N.D. Cal. Dec. 3, 2013) ......................................................... 3

*In re Google, Inc. Privacy Policy Litig.,*
    58 F. Supp. 3d 968, 987–88 (N.D. Cal. 2014)………………………..………..13

*In re Jetblue Airways Corp. Privacy Litig.,*
    379 F. Supp. 2d 299 (E.D.N.Y. 2005) ........................................................... 3, 4, 5

*Jones v. Dirty World Entm't Recordings LLC,*
    755 F.3d 398 (6th Cir. 2014) ............................................................................... 10

*Jules Jordan Video, Inc. v. 144942 Canada Inc.,*
    617 F.3d 1146 (9th Cir. 2010) ........................................................................ 11, 12

*Kimzey v. Yelp! Inc.,*
    836 F.3d 1263 (9th Cir. 2016) .......................................................................... 9, 10

*KNB Enterprises v. Matthews,*
    78 Cal. App. 4th 362 (2000) .......................................................................... 3, 8, 12

*Low v. Linkedin Corp.,*
    2011 WL 5509848 (N.D. Cal. Nov. 11, 2011) ...................................................... 4

*Maloney v. T3Media, Inc.,*
    853 F.3d 1004 (9th Cir. 2017) ........................................................................ 11, 12

*Marshall's Locksmith Serv. Inc. v. Google, LLC,*
    925 F.3d 1263 (D.C. Cir. 2019) ............................................................................ 9

*Miller v. Collectors Universe, Inc.,*
    159 Cal. App. 4th 988 (2008) ............................................................................ 1, 5

*Miller v. Nestande,*
    192 Cal. App. 3d 191 (1987) ............................................................................... 14

*O'Kroley v. Fastcase, Inc.,*
    831 F.3d 352 (6th Cir. 2016) ................................................................................. 9

1   *Perfect 10, Inc. v. Talisman Commc'ns Inc.*,
2       2000 WL 364813 (C.D. Cal. Mar. 27, 2000) ............................................................. 8, 12

3   *Perkins v. Linkedin Corp.*,
        53 F. Supp. 3d 1222 (N.D. Cal. 2014) ..................................................................... 13, 14

4   *Scott v. Metabolife Int'l, Inc.*,
5       115 Cal. App. 4th 404 (2004) ...................................................................................... 14

6   *Shulman v. Grp. W Prods., Inc.*,
        18 Cal. 4th 200 (1998) .................................................................................................... 6

7   *Sikhs for Justice "SFJ", Inc. v. Facebook, Inc.*,
8       144 F. Supp. 3d 1088 (N.D. Cal. 2015) ......................................................................... 8

9   *Sikhs for Justice, Inc. v. Facebook, Inc.*,
        697 F. App'x 526 (9th Cir. 2017) .................................................................................... 8

10  *Simpson Strong-Tie Co. v. Gore*,
        49 Cal. 4th 12 (2010) .................................................................................................... 15
11

12  *Slivinsky v. Watkins-Johnson Co.*,
        221 Cal. App. 3d 799 (1990) .......................................................................................... 2

13  *Toney v. L'Oreal USA, Inc.*,
14      406 F.3d 905 (7th Cir. 2005) ........................................................................................ 11

15  *Vallarta v. United Airlines, Inc.*,
        2020 WL 6271151 (N.D. Cal. Oct. 26, 2020) .............................................................. 13

16  **Statutes**

17  47 U.S.C. § 230 ..................................................................................................................... 8-10

18  Cal. Civ. Code § 3344 ........................................................................................................ passim

19

20  **Other Authorities**

21  Digital Archives, Newton Public Library, *available at*
        https://www.newtongov.org/818/Digital-Archives ............................................................. 6
22

23  Genealogy Resources at the Library, San Francisco Public Library, available at
        https://sfpl.org/locations/main-library/general-collections/genealogy-resources-
24      library ................................................................................................................................ 6

25
26
27
28

## PRELIMINARY STATEMENT

Plaintiffs' Opposition confirms the Complaint is based on unsupportable claims that Ancestry somehow uses plaintiffs' yearbook photos to "advertise" or "endorse" Ancestry. Ancestry uses yearbooks in a simple and non-controversial way: it aggregates and makes searchable already-public yearbook information that plaintiffs admit was created by third parties. Thus, if an Ancestry user searches "Jane Johnson, Roseville, California," Ancestry may indicate it has a yearbook image for a person with that name in that location. Subscribers can take the further step of actually viewing the image to determine if it is the Jane Johnson of interest.

The conceded facts foreclose each of plaintiffs' theories. Because plaintiffs admit the images and information at issue are created and provided by third parties, all claims are barred by section 230 of the Communications Decency Act. Similarly, the Opposition provides no reasoned basis that any alleged use of the yearbook images is not preempted by the Copyright Act. Further, because plaintiffs cannot advance an "endorsement" theory or plausible allegations that these public images of non-celebrities had provable economic value to plaintiffs, they cannot plead injury for any purported "misappropriation" of their likenesses. And plaintiffs cannot show that, by providing another means to access public yearbook photos, Ancestry breached a privacy interest in "highly offensive" information. None of these deficiencies, let alone all of them, can be remedied through amendment. Thus the Complaint should be dismissed with prejudice.

## ARGUMENT

### I.   PLAINTIFFS HAVE NOT ALLEGED A COGNIZABLE INJURY

Plaintiffs' claims are premised on Ancestry's use of yearbook excerpts that plaintiffs themselves allowed to be made public years ago, just like millions of others who attended U.S. schools. Plaintiffs are not celebrities whose names and images have some marketable value. *See Miller v. Collectors Universe, Inc.*, 159 Cal. App. 4th 988, 1006 (2008) (recognizing there is generally "no discernible commercial loss" associated with use of non-celebrities' names and images). Nor can they plausibly allege Ancestry used their names and images to endorse Ancestry or any other product. *Cf. Cohen v. Facebook, Inc.*, 798 F. Supp. 2d 1090, 1097 (N.D. Cal. 2011) ("Plaintiffs have not shown how the mere disclosure to their Facebook friends that they have

employed the Friend Finder service (even assuming some of them did not) causes them any cognizable harm, regardless of the extent to which that disclosure could also be seen as an implied endorsement by them of the service."). Rather, plaintiffs allege only that Ancestry hosted a database of already-public yearbook excerpts and *might* have previewed the availability of these records to the extremely limited universe of users who *might* have searched for these plaintiffs. Given this background, it is unsurprising the three purported "injuries" plaintiffs identify are insufficient as a matter of law. *See* ECF No. 19 at 3-4.

*First,* plaintiffs contend they were denied their statutory right to consent to the use of their images for a commercial purpose. *Id.* at 4. In other words, plaintiffs allege the mere commercial use of a name and image establishes actual injury. But the California legislature has imposed a specific injury requirement for section 3344 claims. See Cal. Civ. Code § 3344(a) (imposing liability where "persons [are] injured as a result"); *Slivinsky v. Watkins-Johnson Co.*, 221 Cal. App. 3d 799, 807 (1990) ("Resulting injury is the *sine qua non* of a cause of action for misappropriation of name"). Accordingly, this is not an instance where the statute confers a substantive right for which a violation alone establishes standing, like the CIPA, wiretap and SCA claims at issue in *Davis v. Facebook, Inc.*, 956 F.3d 589, 598 (9th Cir. 2020), on which plaintiffs rely. *See* ECF No. 19 at 4. Unlike those statutes, permitting a claim to proceed based solely on use of a name or image would negate the statute's separate injury requirement.

Plaintiffs rely on an out-of-context quotation from *Fraley v. Facebook, Inc.*, 830 F. Supp. 2d 785 (N.D. Cal. 2011) to assert a "violation of their individual statutory rights under California Civil Code § 3344 . . . [is] an invasion of a legally protected interest for Article III purposes." ECF No. 19 at 4 (quoting *Fraley*, 830 F. Supp. 2d at 797). However, plaintiffs ignore that this was merely the beginning of the court's inquiry—after addressing whether a "legally protected interest" had been invaded, and consistent with the required analysis for both Article III and statutory standing under section 3344, the court correctly went on to assess whether the claimed injury was sufficiently "concrete." *Fraley*, 830 F. Supp. 2d at 797-801. The court did not rely on the violation itself to establish injury, or even the mere use of plaintiffs' names and images. Instead, the *Fraley* court found concrete injury based on factual allegations that demonstrated both

(a) a "personalized endorsement of products, services, and brands to their friends and acquaintances," and (b) that this endorsement had "concrete, provable value[.]"  *Id.* at 799-800.

Here, by contrast, merely stating that yearbook images of a given individual might be available cannot fairly be deemed an "endorsement" of Ancestry.  It is akin to a company that promotes a vast catalogue of sports posters that includes Tiger Woods and Serena Williams. Simply giving examples of inventory available does not suggest Woods or Williams "endorse" the poster company.[1]  Nor have plaintiffs here alleged (nor can they allege) any "concrete, provable value" to their yearbook images (*id.*), which have been freely available since first published.  *See In re Jetblue Airways Corp. Privacy Litig.*, 379 F. Supp. 2d 299, 327 (E.D.N.Y. 2005) ("[T]here is absolutely no support for the proposition that the personal information of an individual JetBlue passenger had any value for which that passenger could have expected to be compensated.").

**Second,** plaintiffs argue that any profits by Ancestry from using plaintiffs' images suffice to confer standing.  ECF No. 19 at 3-4.  However, courts have consistently rejected that position. *See, e.g., In re Google, Inc. Privacy Policy Litig.*, No. C-12-01382-PSG, 2013 WL 6248499, at *5 (N.D. Cal. Dec. 3, 2013) ("a plaintiff must do more than point to the dollars in a defendant's pocket; he must sufficient[ly] allege that in the process he lost dollars of his own.").  In urging a contrary result, plaintiffs contend *Davis* and *Fraley* deemed enrichment of the defendant alone suffices for injury.  *See* ECF No. 19 at 3.[2]  Again, plaintiffs misleadingly describe only isolated aspects of those decisions.  In both *Davis* and *Fraley*, it was not the defendants' profit that provided the requisite injury, but that defendant profited from something in which plaintiffs held a valuable property interest.  *Fraley*, 830 F. Supp. 2d at 799 ("Plaintiffs assert that **they have a tangible property interest in their personal endorsement of Facebook advertisers' products to**

---

[1] Plaintiffs' suggestion that Ancestry's use of their names and images "could reasonably create confusion as to whether Plaintiffs endorse Ancestry," ECF No. 19 at 15, is belied by the screenshots in the Complaint, ECF No. 1 at ¶¶ 39-44, which contain *nothing* to suggest plaintiffs endorse Ancestry and show the *user* must search to determine whether yearbook records even exist on the site. *See e.g., id.* at ¶ 39 (records are the "results of a search" for plaintiffs' names).
[2] Plaintiffs also cite *KNB Enterprises v. Matthews*, 78 Cal. App. 4th 362 (2000), which only addressed Copyright Act preemption, not sufficiency of injury allegations. *See* ECF No. 19 at 3-4.

1    *their Facebook Friends*, and that Facebook has been unlawfully profiting from the nonconsensual

2    exploitation of Plaintiffs' statutory right of publicity") (emphasis added); *Davis*, 956 F.3d at 600

3    (plaintiffs alleged "a study that values users' browsing histories at $52 per year, as well as

4    research panels that pay participants for access to their browsing histories").  By contrast,

5    plaintiffs here cannot plausibly allege a stake in any Ancestry profits.  Unlike the personal

6    endorsements or private browsing history in *Fraley* and *Davis*, both plaintiffs already made the

7    information available for free when originally published in the yearbooks.  Telling plaintiff's

8    friends, "Meredith Callahan loves Bob's Book Store" would be quite different from her friend

9    searching Bob's Book Store's inventory and finding it has a book in which Ms. Callahan agreed to

10   appear—while the former personal endorsement might have some tangible value to plaintiff,

11   merely confirming the availability of information she already chose to share does not.  Ancestry's

12   profits resulted from the services it offered—access to aggregated, searchable records for

13   genealogy research—not from the value of plaintiffs' specific yearbook records, which could have

14   been (and were) shared by others who had copies of the yearbooks.  *See* ECF No. 1 at ¶ 49

15   (alleging yearbooks were donated by others); *In re Jetblue*, 379 F. Supp. 2d at 327 ("absolutely no

16   support for the proposition" that individual passengers' personal information had any value for

17   which they should have expected to be compensated).  *See also Fraley*, 830 F. Supp. 2d at 798

18   (distinguishing *Low v. Linkedin Corp.*, No. 11-cv-01468, 2011 WL 5509848 (N.D. Cal. Nov. 11,

19   2011), where "general allegation that the data collection industry considers consumer information

20   valuable was insufficient to establish standing where he failed to allege . . . how such collection

21   deprived him of the economic value of his data").

22       ***Third,*** plaintiffs contend they were injured by Ancestry's failure to pay for the purported

23   commercial use of their likenesses.  ECF No. 19 at 4.  This position again fails to give effect to the

24   separate "injury" requirement in section 3344—it would mean every commercial use of a likeness

25   without compensation would automatically result in injury without any further showing.  *Cf.*

26   *Cohen*, 798 F. Supp. 2d at 1097 (plaintiffs failed to allege injury despite defendant's use of their

27   names and images).  Section 3344 does not presume inherent commercial value in a plaintiff's

28   name and image, and cases interpreting the statute have recognized there is generally "no

discernible commercial loss" associated with use of non-celebrities' names and images, such as plaintiffs here. *See Miller*, 159 Cal. App. 4th at 1006. And even if plaintiffs could plausibly claim their names and yearbook images had some inherent commercial value (they cannot), plaintiffs abandoned that value by consenting to appear in public yearbooks in the first instance.[3]

Further, plaintiffs fail to allege any user *actually* searched for plaintiffs on Ancestry's website (such that they might have seen the thumbnail previews screenshotted in plaintiffs' complaint) or accessed plaintiffs' yearbook records. Plaintiffs purport to dispute this (*see* ECF No. 19 at 7), but the allegations they cite do not support their assertion. *See* ECF No. 1 at ¶¶ 25-55 (alleging only that users had "the *ability* to search for" plaintiffs' records, had "*access*" to those records, and "*may* search" for such records; alleging "on information and belief" that Ancestry included plaintiffs' yearbook records in "promotional emails," with no allegation the recipients ever accessed those emails or were drawn to Ancestry's site as a result). Plaintiffs implausibly contend they were injured even if ***no one*** actually viewed their likeness, arguing "[t]he injury recognized by § 3344 occurred when Ancestry created the records containing Plaintiffs' likenesses and placed them in its database." ECF No. 19 at 7. This position once again reads out of the statute its "actual injury" requirement. Mere "availability" of the image or information is not sufficient, especially where, as here, plaintiffs claim their records were among "billions" of others available to search. *See* ECF No. 1 at ¶¶ 3, 26, 29, 38, 41, 53-54. Plaintiffs have not lost anything, and Ancestry has not gained anything at plaintiffs' expense, from records that merely exist, unviewed, in Ancestry's massive database. *Cf. Beck v. McDonald*, 848 F.3d 262, 269 (4th Cir. 2017) (no Article III injury where leaked medical records were not accessed by anyone—it was implausibly "attenuated" to assume a thief would "select [plaintiff]'s report from the over 3,600 reports in the missing boxes"); *In re Jetblue*, 379 F. Supp. 2d at 327 (no value in individual personal information)).

---

[3]   That plaintiffs subjectively believed their yearbook images held interest only to "immediate family and classmates," ECF No. 19 at 1, 8 merely confirms their likenesses lack independent commercial value. Plaintiffs could not reasonably expect the images would not be more widely disseminated because they cannot allege any restrictions barred public distribution.

II.      **THE "PUBLIC AFFAIRS" EXCEPTION APPLIES**

Plaintiffs make two misguided arguments to avoid section 3344's exception for use of names and images "in connection with any news [or] public affairs." Cal. Civ. Code § 3344(d).

*First,* plaintiffs contend the information is not "newsworthy" because no "public interest" allegedly exists in information concerning private individuals. (ECF No. 19 at 8-9).  It is well settled, however, that "newsworthiness is not limited to 'news' in the narrow sense of reports of current events. It extends also to the use of names, likenesses or facts . . .  for purposes of education, amusement or enlightenment," as long as "some reasonable members of the community could entertain a legitimate interest in it[.]"  *Shulman v. Grp. W Prods., Inc.*, 18 Cal. 4th 200, 225 (1998).  Ancestry's collection of yearbook records is precisely the type of information gathering for the public's benefit that this exception protects.  The yearbook database serves a valuable purpose in documenting local history and allowing people to trace their genealogies.[4] Because these historical images and information can only be accessed by an affirmative search initiated by an Ancestry user, these circumstances conclusively demonstrate a purpose of  "education, amusement or enlightenment," any of which supports application of the public affairs exception to section 3344.  *See Shulman*, 18 Cal. 4th at 225.

The exception does not apply only to public figures, as plaintiffs contend.  Rather, the law seeks to balance privacy rights against the public's right to information by assessing the facts revealed in proportion to the public's interest.  *Id.* at 222-24 ("a logical nexus [must] exist between the complaining individual and the matter of legitimate public interest.") (quotation, citation omitted).  For example, a photograph of a private couple embracing qualified as "newsworthy"

---

[4]  Indeed, public libraries that archive yearbooks regularly describe the public historical and genealogical research purposes served by such collections.  *See, e.g.,* Digital Archives, Newton Public Library, *available at* https://www.newtongov.org/818/Digital-Archives ("The Newton Public Library Digital Archive includes . . . yearbooks that record the history of Jasper County's schools, government, businesses, and residents."); Genealogy Resources at the Library, San Francisco Public Library, available at https://sfpl.org/locations/main-library/general-collections/genealogy-resources-library ("The San Francisco History Center . . . has an extensive collection of high school yearbooks going back to the 1800s that can assist with genealogical research, especially photographs.").

1   because it "serve[d] the function of entertainment as a matter of legitimate public interest."  *Gill v.*

2   *Hearst Pub. Co.*, 40 Cal. 2d 224, 229 (1953).  However, when that same photograph was

3   juxtaposed with the disclosure of private facts—specifically, where it was identified as the "wrong

4   kind of love," "founded upon 100 per cent sex attraction"—the use was not protected because the

5   nexus was lost; the information about plaintiffs' love life was superfluous to the public interest in

6   the photograph.  *Gill v. Curtis Publ'g Co.*, 38 Cal. 2d 273, 279 (1952).

7         Here, the public interest in this information (whether historical, genealogical or

8   entertainment) is entirely coextensive with the information shared—there has been no use of

9   plaintiffs' names or images outside of the underlying yearbook records of which they are a part.

10  In other words, Ancestry did not add some salacious or gratuitous commentary about plaintiffs,

11  unrelated to the public's interest in the underlying documents, to garner interest in the records.

12  Instead, it simply disclosed to prospective users that the records exist in Ancestry's database.

13        ***Second,*** plaintiffs argue that the newsworthiness exception cannot apply when the

14  information was used in connection with  commercial activity.  ECF No. 19 at 9-11.  But the

15  statute expressly exempts use of a person's name or image in products or advertising if such use is

16  connection with any news or public affairs.  Cal. Civ. Code § 3344(d).  To interpret the statute as

17  plaintiffs have—that the commercial nature of an enterprise automatically precludes application of

18  the exception—would negate the exception entirely.  Plaintiffs rely on *Abdul-Jabbar v. General*

19  *Motors Corporation*, 85 F.3d 407 (9th Cir. 1996), in which a famous basketball player's name and

20  image were used in a car commercial.  The exception did not apply there because the use bore no

21  relationship to the newsworthiness of plaintiff's basketball record, not merely because it was used

22  in a commercial context.  *Id.* at 416.  Likewise, in *Fraley*, the court determined that although the

23  plaintiffs' underlying actions (their "likes" of certain products) could be considered

24  "newsworthy," once Facebook converted that information into plaintiffs' purported endorsements

25  of particular products, it was no longer connected to the public interest in the events.  *Fraley*, 830

26  F. Supp. 2d at 805.  In other words, the cases turn not on whether a defendant is engaged in

27  commercial activity, but rather if the information is used to *endorse* a product (impermissible) or

28  if the information *is* the product (permissible).  Otherwise, if the San Francisco Chronicle

1    previewed an article about President Biden's inauguration that included his image, but required

2    readers to go through a paywall to access it, the article would lose the protection of this exception.

3    That is of course not the law.  Here, Ancestry's use of the information and the public's interest in

4    the information are one and the same.  Ancestry hosts yearbook records and the purported

5    "advertisements" simply preview the existence of these records in Ancestry's database—unlike

6    *Abdul-Jabbar* or *Fraley*, plaintiffs' yearbook images are not used to advertise some unrelated

7    product.  Rather, Ancestry's use is akin to the previewed news article accessible behind a paywall,

8    and falls under this exception to section 3344.

9    **III.    SECTION 230 OF THE CDA BARS ALL PLAINTIFFS' CLAIMS**

10           Plaintiffs first contend section 230 of the Communications Decency Act applies only

11   where a defendant obtained the information at issue directly from the author, not a third party.

12   ECF No. 19 at 11.  As plaintiffs would have it, Twitter (for example) could be held liable for

13   defamation if a user copies and pastes a defamatory comment from a third party, but would not be

14   liable if the user wrote and posted the comment.  That is not the law, and plaintiffs provide no

15   authority for this proposition.[5]  Rather, as one court explained, the statute's reference to "'another

16   information content provider' distinguishes the circumstance in which the interactive computer

17   service itself meets the definition of 'information content provider' with respect to the information

18   in question. . . . Put another way, 'third-party content' is used to refer to content created entirely

19   by individuals or entities other than the interactive computer service provider." *Sikhs for Justice*

20   *"SFJ", Inc. v. Facebook, Inc.*, 144 F. Supp. 3d 1088, 1094 (N.D. Cal. 2015), *aff'd sub nom. Sikhs*

21   *for Justice, Inc. v. Facebook, Inc.*, 697 F. App'x 526 (9th Cir. 2017).  The fact that content

22   emanates from a third party is sufficient to trigger protection of section 230; no requirement exists

23   of direct interaction between host and "author," as plaintiffs advocate.  *See* 47 U.S.C. § 230.

24           Plaintiffs concede "the photographs and information that Ancestry uses as its raw materials

25

26           [5]  Plaintiffs cite *KNB Enterprises* and *Perfect 10, Inc. v. Talisman Commc'ns Inc.*, No. CV99-
27   10450 RAP MCX, 2000 WL 364813 (C.D. Cal. Mar. 27, 2000), ECF No. 19 at 11, but neither
     case even mentions section 230 of the CDA.
28

1    are sourced from yearbooks Ancestry did not create[.]"  ECF No. 19 at 12.  Nonetheless, plaintiffs

2    contend Ancestry must be treated as an "information content provider" based on its role (a)

3    extracting information from the yearbook pages (names, photographs, yearbook dates) into a

4    different format; (b) isolating pictures that appeared among others in the yearbook; and (c) adding

5    "interactive buttons."  *Id.*  But each of  these actions fall within a publisher's traditional functions

6    and are insufficient to shoehorn Ancestry into the "restrictive definition of 'information content

7    provider.'"  *Goddard v. Google, Inc.*, 640 F. Supp. 2d 1193, 1196 (N.D. Cal. 2009) (citation

8    omitted).  For example, in *Marshall's Locksmith Serv. Inc. v. Google, LLC*, 925 F.3d 1263 (D.C.

9    Cir. 2019), the plaintiffs argued Google was an "information content provider" where it created

10   "enhanced content that was derived from third-party content, but has been so augmented and

11   altered as to have become new content."  *Id.* at 1269.  The court rejected the notion that "data []

12   collected from a third party and re-presented in a different format" "constitute[s] the 'creation' or

13   'development' of information[.]"  *Id.*  Were it otherwise, "nothing would be" immune: "every

14   representation by a search engine of another party's information requires the translation of a

15   digital transmission into textual or pictorial form[.]"  *Id.*[6]   *See also Kimzey*, 836 F.3d at 1269-70

16   (finding CDA immunity even where Yelp! took reviews from a different website and added a star

17   rating); *O'Kroley v. Fastcase, Inc.*, 831 F.3d 352, 355 (6th Cir. 2016) (finding CDA immunity

18   even where Google had performed some "automated editorial acts on the content, such as

19   removing spaces and altering font" and "kept the search result up even after [the plaintiff]

20   _____

21       [6]  The only content plaintiffs could conceivably point to as not directly extracted from the
     yearbook is the estimated birth year and age.  *See* ECF No. 19 at 12.  However, this "estimate" is
22   derived from the third-party yearbook content (specifically, plaintiffs' class years).  In *Marshall's*,
     the court relied on two Ninth Circuit cases to reject a similar contention.  925 F.3d at 1270 (citing
23   *Kimzey v. Yelp!, Inc.*, 836 F.3d 1263, 1270 (9th Cir. 2016) and *Carafano v. Metrosplash.com, Inc.*,
     339 F.3d 1119, 1125 (9th Cir. 2003)).  Where third-party locksmiths did not have an exact
24   location listed, Google nonetheless created a map pinpoint to reflect the location of the business.
     *Id.*  Although Google created the pinpoint, the court held it was "derived" from information
25   provided by the third party and "constrained by the underlying third-party information," and thus
     Google was not the information content provider.  *Marshall's*, 925 F.3d at 1269.  So too here,
26   where the estimated birth year and age are simply mechanically derived from the third-party
27   yearbook content.

28

1    complained about it"); *Jones v. Dirty World Entm't Recordings LLC*, 755 F.3d 398, 416 (6th Cir.

2    2014) ("The CDA expressly bars 'lawsuits seeking to hold a service provider liable for its exercise

3    of a publisher's traditional editorial functions—such as deciding whether to publish, withdraw,

4    postpone or alter content.'") (citation omitted).

5         Likewise, Ancestry's "interactive buttons" are insufficient to transform it into an

6    "information content provider."  As a preliminary matter, it is the use of plaintiffs' yearbook

7    information that plaintiffs challenge—the content-neutral button on Ancestry's webpage

8    prompting users to "Upgrade Now" has nothing to do with the conduct underlying plaintiffs'

9    Complaint.  *Cf. Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC*, 521 F.3d

10   1157, 1167 (9th Cir. 2008) ("[T]he broadest sense of the term 'develop' could include the

11   functions of an ordinary search engine—indeed, just about any function performed by a website. .

12   . . we interpret the term 'development' as referring not merely to augmenting the content

13   generally, but to materially contributing to its alleged unlawfulness.").  Were it the case that a

14   website's interactive buttons could render them responsible for third-party content, the CDA

15   would be gutted.  *See id.*  In any event, merely providing an interface with links to the third-party

16   content, as here, cannot fairly be deemed the "creation" or "development" of information.  *See,*

17   *e.g., Atl. Recording Corp. v. Project Playlist, Inc.*, 603 F. Supp. 2d 690, 701 (S.D.N.Y. 2009)

18   (defendant was not an "information content provider" where it provided "links for users to

19   download that third-party content").[7]

20        Plaintiffs rely solely on *Fraley*, but as demonstrated in Ancestry's motion (ECF No. 13 at

21   15-16), *Fraley* is readily distinguishable.  There, Facebook created the "Sponsored Story" in

22   which the plaintiffs' content appeared as an endorsement of various products.  830 F. Supp. 2d at

23   801.  By contrast, plaintiffs here cannot identify any separate "content" created by Ancestry as the

24   basis for their claims, and instead rely on the yearbook excerpts, previews of those excerpts, and

25   _____

26        [7]  To the extent plaintiffs attempt to claim Ancestry's distribution of the information can
     transform it into an "information content provider," this too is insufficient.  *Kimzey*, 836 F.3d at
27   1270–71 ("Simply put, proliferation and dissemination of content does not equal creation or
     development of content.").
28

1    information extracted from those excerpts, none of which can be characterized as content

2    "created" or "developed" by Ancestry.

3    **IV.    PLAINTIFFS' CLAIMS ARE PREEMPTED BY THE COPYRIGHT ACT**

4           In an effort to avoid preemption, plaintiffs first contend that only the copyright holder can

5    claim preemption under the Copyright Act.  ECF No. 19 at 13-14.  The Ninth Circuit has

6    explicitly rejected this position.  *Jules Jordan Video, Inc. v. 144942 Canada Inc.*, 617 F.3d 1146,

7    1154–55 (9th Cir. 2010) ("We do not read *Fleet* or the Copyright Act so narrowly.  Whether a

8    claim is preempted under Section 301 does not turn on what rights the alleged infringer possesses,

9    but on whether the rights asserted by the plaintiff are equivalent to any of the exclusive rights

10   within the general scope of the copyright. . . . If a plaintiff asserts a claim that is the equivalent of

11   a claim for infringement of a copyrightable work, that claim is preempted, regardless of what legal

12   rights the defendant might have acquired.") (discussing *Fleet v. CBS, Inc.*, 50 Cal. App. 4th 1911

13   (1996), on which plaintiffs rely here).

14          Plaintiffs next argue that their claims stem from their "likenesses," which are not

15   copyrightable.  ECF No. 19 at 14-15.  Although plaintiffs' likenesses do appear in the underlying

16   yearbook records, this is true of every photograph in which a person appears.  *See Maloney v.*

17   *T3Media, Inc.*, 853 F.3d 1004, 1011 (9th Cir. 2017) (preemption where "likeness has been

18   captured in a copyrighted artistic visual work and the work itself is being distributed for personal

19   use").  The relevant inquiry instead depends on the *use* of the likeness: "The basis of a right of

20   publicity claim concerns the message—whether the plaintiff endorses, or appears to endorse the

21   product in question."  *Id.* (quoting *Toney v. L'Oreal USA, Inc.*, 406 F.3d 905, 910 (7th Cir. 2005)).

22          Plaintiffs argue their likenesses were used to promote Ancestry's products, but plaintiffs'

23   allegations demonstrate these "advertisements" were nothing more than previews of the

24   underlying records to inform users of their availability.  *See* ECF No. 1 at ¶¶ 27, 39; *Jules Jordan*,

25   617 F.3d at 1154 ("The pictures on the covers of the DVDs are 'still shots' of the copyrighted

26   video performance.  Thus, Gasper's argument that his right of publicity was violated by

27   defendants' reproduction of the covers is misguided.").  The facts in *Maloney* are analogous—

28   there, as here, "[c]onsumers could view digital thumbnails of the images" available for sale and

were given the option to purchase the full versions of the photographs. *Maloney*, 853 F.3d at 1007. Plaintiffs' claims were preempted. By comparison, in *Downing v. Abercrombie & Fitch*, 265 F.3d 994 (9th Cir. 2001), on which plaintiffs rely, "Abercrombie went well beyond the mere republication of the photograph. Rather, it published the photo in connection with a broad surf-themed advertising campaign, identified the plaintiffs-surfers by name, and offered for sale the same t-shirts worn by the plaintiffs in the photo. ***Importantly, we said that Abercrombie had suggested that the surfers had endorsed Abercrombie's t-shirts***." *Maloney*, 853 F.3d at 1013-14 (discussing *Downing*, 265 F.3d 994) (internal quotations, citations, alterations omitted) (emphasis added).[8]

Here, plaintiffs cannot plausibly contend their names or images were used to make it appear they endorsed Ancestry. *See supra*, fn. 1. Rather, plaintiffs' allegations concerning use of their names and images arise solely from reproduction of pages from their yearbooks, and are thus preempted by the Copyright Act.

## V.   NO PLAUSIBLE CLAIM EXISTS FOR INTRUSION UPON SECLUSION

Plaintiffs rely exclusively on *In re Facebook, Inc., Consumer Privacy User Profile Litig.*, 402 F. Supp. 3d 767 (N.D. Cal. 2019) to support their intrusion-upon-seclusion claim, but the facts here differ materially. ECF No. 19 at 15-16. As to the first prong—whether plaintiffs had a reasonable expectation of privacy—the information in *Facebook* was shared only with a select group of Facebook "friends." *Id.* at 782-83. The court explicitly distinguished this limited sharing of information from "a user whose settings allow information to be shared not only with friends, but friends of friends," who likely "loses any expectation of privacy." *Id.* at 783 n. 3. Yearbooks are not akin to private messages or other information on Facebook to which the user can limit

---

[8]  Plaintiffs also rely on *KNB Enterprises*, 78 Cal. App. 4th at 372 and *Perfect 10*, 2000 WL 364813 to contend they do not have to identify a use of their likeness independent of the display and production of the copyrighted work to avoid preemption. ECF No. 19 at 15. Neither case is apt. In *KNB*, the court rejected preemption based on its (incorrect) holding that only the copyright holder can claim preemption. 78 Cal. App. 4th at 374. As noted above, the Ninth Circuit has explicitly rejected this view. *Jules Jordan*, 617 F.3d at 1154-55. And *Perfect 10, Inc.* involved a default judgment that did not address preemption at all. 2000 WL 364813.

access—rather, like the Facebook users who allow information to be seen not only by "friends, but friends of friends," plaintiffs could not restrict distribution of their yearbooks once they were published; their classmates were free to share them with whoever they wished.  Further, unlike the "sensitive personal information" at issue in *Facebook*, here the yearbook information is otherwise public even apart from its inclusion in the yearbook—names, depictions of plaintiffs' faces, and their school activities are not private matters.  *See* ECF No. 13 at 18-19.

For these same reasons, *Facebook* is distinguishable as to the second prong—whether the disclosure would be "highly offensive to a reasonable person."  Unlike the "religious preferences," private photographs, or "one-on-one messages" at issue in *Facebook* (402 F. Supp. 3d at 780), the information at issue here is benign, public information that plaintiffs themselves chose to share in the first instance.  ECF No. 13 at 19-20.  Contrary to plaintiffs' suggestion that *Facebook* turned solely on the widespread dissemination of the information, it is instead the nature of the information disseminated that is determinative.  *Compare Facebook*, 402 F. Supp. 3d at 797 ("[P]laintiffs have adequately alleged that they suffered an egregious invasion of their privacy when Facebook gave app developers and business partners their ***sensitive information*** on a widespread basis.") (emphasis added), *with In re Google, Inc. Privacy Policy Litig.*, 58 F. Supp. 3d 968, 987–88 (N.D. Cal. 2014) (finding the disclosure of a person's name and identity, contact list, and contents of communications to third-party developers was not highly offensive).

VI.    **PLAINTIFFS' UNJUST ENRICHMENT CLAIM FAILS**

As plaintiffs' cases recognize, some California courts have endorsed a standalone claim for unjust enrichment.  *ESG Capital Partners, LP v. Stratos*, 828 F.3d 1023, 1038 (9th Cir. 2016) ("Some California courts allow a plaintiff to state a cause of action for unjust enrichment, while others have maintained that California has no such cause of action.").  Even crediting this view, plaintiffs' claim is derivative of their section 3344 claim, ECF No. 1 at 86 (asserting Ancestry "misappropriated" plaintiffs' information), and thus fails for the same reasons, *see, e.g., Vallarta v. United Airlines, Inc.*, No. 19-cv-05895-HSG, 2020 WL 6271151, at *12 (N.D. Cal. Oct. 26, 2020) (unjust enrichment claim fails when premised on same conduct as another dismissed claim).

## VII.   PLAINTIFFS ARE NOT ENTITLED TO STATUTORY DAMAGES

Plaintiffs create a straw conflict between *Fraley*, 830 F. Supp. 2d 785 and *Perkins v. Linkedin Corp.*, 53 F. Supp. 3d 1222 (N.D. Cal. 2014) to argue a claim for economic damages suffices to invoke section 3344's statutory damages provision.  ECF No. 19 at 17-18.  No conflicts exist.  As observed in *Perkins*, the proper reading of *Fraley* is that the section 3344 claim was not dismissed in its entirety because plaintiffs had *also* claimed actual damages; and the *Fraley* court expressly held plaintiffs would need to "prove actual damages like any other plaintiff whose name has commercial value[.]"  *Perkins*, 53 F. Supp. 3d at 1244-45 (quoting *Fraley*, 830 F. Supp. 2d at 809).  In other words, both *Fraley* and *Perkins* correctly followed California law and found a claim for economic damages insufficient to support a claim for statutory damages.  The cases do not conflict, and the Court should strike plaintiffs' statutory damages claim.

## VIII.   CALIFORNIA'S ANTI-SLAPP STATUTE APPLIES

Plaintiffs first contend California's anti-SLAPP statute does not apply because the speech at issue did not concern "an issue of public interest."  ECF No. 19 at 19-20.  Once again, plaintiffs advocate an overly narrow interpretation—the speech need not "warn the public against fraud or harassment" or take the form of a "published [] documentary" to be a matter of "public interest." *See id.*  "[M]atters in the public interest are not restricted to current events," nor does the precise medium dictate the constitutional protection afforded.  *Dora v. Frontline Video, Inc.*, 15 Cal. App. 4th 536, 543 (1993); *Miller v. Nestande*, 192 Cal. App. 3d 191, 198 (1987) ("First Amendment publications are rooted in the inherent worth of informing the public, not on the identity of the source.").  For the reasons discussed above (at Part II) and in Ancestry's motion (ECF No. 13 at 22-24), the speech at issue concerns a matter of "public interest."

Plaintiffs also rely on *Scott v. Metabolife Int'l, Inc.*, 115 Cal. App. 4th 404 (2004) to contend speech associated with a commercial purpose cannot be a matter of "public interest." ECF No. 19 at 20-21.  But the *Scott* court determined "a manufacturer's advertising of a specific consumer product, on its labels, and to the public, for the purpose of selling that product" did not concern an issue of public interest.  *Scott*, 115 Cal. App. 4th at 420.  The facts here differ materially—plaintiffs do not challenge a specific product label, and instead seek to prohibit

1   Ancestry from making available a database of information that has historical and genealogical

2   significance.  That portions of this database are available only to subscribing customers—like a

3   newspaper article behind a paywall—does not categorically remove it from the public interest

4   exception.  *Guglielmi v. Spelling–Goldberg Productions*, 25 Cal. 3d 860, 868–69 (1979) ("The

5   First Amendment is not limited to those who publish without charge").[9]

6          Alternatively, plaintiffs contend this case falls within California's anti-SLAPP exception

7   for actions brought "in the public interest."  ECF No. 19 at 20-21.  This exception must be

8   construed narrowly and does not apply here.  *See Simpson Strong-Tie Co. v. Gore,* 49 Cal. 4th 12,

9   22 (2010) ( *"*[T]he public interest exemption . . . should be narrowly construed.").  The "public

10  interest" exception "bars a litigant seeking 'any' personal relief from relying on the" exception.

11  *Club Members for an Honest Election v. Sierra Club*, 45 Cal. 4th 309, 317 (2008).  Among other

12  remedies, plaintiffs seek restitution and actual damages, which would directly benefit plaintiffs as

13  opposed to the public at large.  ECF No. 1 at Prayer for Relief.  Accordingly, the exception does

14  not apply.  *See, e.g., Blackburn v. ABC Legal Servs., Inc.*, No. C 11-01298 JSW, 2011 WL

15  8609453, at *3 (N.D. Cal. June 16, 2011) ("Plaintiff seeks an award of actual damages. . . .

16  Because Plaintiff seeks relief to directly benefit herself, the Section 425.17(b) exception is

17  inapplicable.").

18                                    *       *       *

19          Finally, for the reasons above and in Ancestry's motion, plaintiffs cannot demonstrate a

20  probability of success on the merits.  Accordingly, the Court should strike plaintiffs' claims.

21          Respectfully submitted,

22

23  _____

24     [9]  Plaintiffs do not appear to argue the exception in Cal. Code Civ. P. 425.17(c) applies, nor
25  could they.  "[T]hat the provision exempts 'only a subset of commercial speech'—specifically,
    comparative advertising."  *FilmOn.com Inc. v. DoubleVerify Inc.*, 7 Cal. 5th 133, 147-48 (2019).
26  To invoke the exception, "the harm plaintiffs allege would have to derive from [Ancestry's]
    representations about [its] own business or a competitor's business."  *Dziubla v. Piazza*, 59 Cal.
27  App. 5th 140 (2020).  This is not a case between business competitors, and plaintiffs do not allege
    they were harmed as a result of some representation of fact.
28

DATED:  January 26, 2021        QUINN EMANUEL URQUHART &
SULLIVAN, LLP


By *Shon Morgan*
Shon Morgan
Attorneys for ANCESTRY.COM OPERATIONS
INC., ANCESTRY.COM INC., and
ANCESTRY.COM LLC

REPLY ISO DEFENDANTS' MOTION TO DISMISS AND STRIKE