# EXHIBIT A

Docket No. 19-1774

UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

# Maddox v. Bank of N.Y. Mellon Tr.

Decided May 10, 2021

Docket No. 19-1774

05-10-2021

SANDRA MADDOX, TOMETTA MADDOX HOLLEY, on behalf of themselves and all others similarly situated, Plaintiffs-Appellees, v. THE BANK OF NEW YORK MELLON TRUST COMPANY, N.A., Defendant-Appellant.

JONATHAN M. ROBBIN, Blank Rome LLP, New York, NY, for Defendant-Appellant Bank of New York Mellon Trust Company. SETH R. LESSER, Klafter Olsen & Lesser LLP, Rye Brook, NY, for Plaintiffs-Appellees Maddox et al. ERIC LECHTZIN, Berger & Montague, P.C., Philadelphia, PA (on the brief), for Plaintiffs-Appellees Maddox et al. CHARLES MARSHALL DELBAUM, National Consumer Law Center, Boston, MA (on the brief), for Plaintiffs-Appellees Maddox et al. William Alvarado Rivera, Julie Nepveu, AARP Foundation, Washington, DC, and Brian L. Bromberg, Joshua Tarrant-Windt, Bromberg Law Office, P.C., New York, NY, for AARP, AARP Foundation, and National Association for Consumer Advocates, amici curiae in support of Plaintiffs-Appellees Maddox et al.

POOLER and CARNEY, Circuit Judges

Before: JACOBS, POOLER, and CARNEY, *Circuit Judges*.

Appeal from an order of the United States District Court for the Western District of New York (Richard Joseph Arcara, *J.*) denying the motion of the Bank of New York Mellon Trust Company's ("BNY Mellon" or "the Bank") for \*2 judgment on the pleadings. The district court concluded that plaintiffs have Article III standing to sue BNY Mellon for violating the timely recordation requirements imposed by New York State's mortgage-satisfaction-recording statutes and certified the question for interlocutory appeal.

On review, we hold, first, that state legislatures may create legally protected interests whose violation supports Article III standing, subject to certain federal limitations. We further decide that the New York law violations alleged here constitute a concrete and particularized harm to plaintiffs in the form of both reputational injury and limitations in borrowing capacity over the nearly ten-month period during which their mortgage discharge was unlawfully not recorded and in which the Bank allowed the public record to reflect, falsely, that plaintiffs had an outstanding debt of over $50,000. In addition, the Bank's failure to record plaintiffs' mortgage discharge created a material risk of concrete and particularized harm to plaintiffs by providing a basis for an unfavorable credit rating and reduced borrowing capacity. These risks and interests, in addition to that of clouded title, which an ordinary mortgagor would have suffered (but plaintiffs did not), are similar to those protected by traditional actions at law. Whether better characterized as "substantive" or "procedural" \*3 wrongs, the Bank's violations of the state statutes are plausibly alleged to have caused actual harm and subjected plaintiffs to a real risk of material harm, the very sort of which the state statutes appear designed to protect mortgagors such as plaintiffs against. As a result, we conclude that the Maddoxes' allegations support their Article III standing, and that they may pursue their claims for the statutory penalties

imposed by the New York Legislature, and other relief, in the federal district court, subject to compliance with other jurisdictional prerequisites and class certification requirements.

Order affirmed and case remanded.

Judge Jacobs dissents in a separate opinion. JONATHAN M. ROBBIN, Blank Rome LLP, New York, NY, *for Defendant-Appellant Bank of New York Mellon Trust Company*. SETH R. LESSER, Klafter Olsen & Lesser LLP, Rye Brook, NY, *for Plaintiffs-Appellees Maddox et al*. ERIC LECHTZIN, Berger & Montague, P.C., Philadelphia, PA (*on the brief*), *for Plaintiffs-Appellees Maddox et al*. *4 CHARLES MARSHALL DELBAUM, National Consumer Law Center, Boston, MA (*on the brief*), *for Plaintiffs-Appellees Maddox et al*. William Alvarado Rivera, Julie Nepveu, AARP Foundation, Washington, DC, and Brian L. Bromberg, Joshua Tarrant-Windt, Bromberg Law Office, P.C., New York, NY, *for* AARP, AARP Foundation, and National Association for Consumer Advocates, *amici curiae in support of Plaintiffs-Appellees Maddox et al*. POOLER and CARNEY, *Circuit Judges*:

The Bank of New York Mellon Trust Company ("BNY Mellon" or "the Bank") appeals from an order of the United States District Court for the Western District of New York (Richard Joseph Arcara, *J.*) denying its motion for judgment on the pleadings. The district court held that plaintiffs Sandra Maddox and Tometta Maddox Holley (the "Maddoxes") have Article III standing to seek the statutory damages from the Bank for its violations of New York's mortgage-satisfaction-recording statutes. N.Y. Real P. Law ("R.P.L.") § 275, N.Y. Real P. Actions & Proc. L. ("R.P.A.P.L.") § 1921. These statutes require mortgage lenders to record satisfactions of mortgage (also known as "certificates of discharge") within thirty days of the borrower's repayment; a failure renders the lender "liable to the mortgagor" for increasing statutory damages in amounts *5 dependent on the tardiness of the ultimate filing. Here, the Bank did not record the satisfaction of the Maddoxes' mortgage, in an amount of over $50,000, until almost eleven months after full payment was received—almost ten months after the law requires. The statutes make the lender liable to the mortgagor for $1,500 upon a filing of satisfaction that is presented for filing over ninety days after discharge. R.P.L. § 275(1); R.P.A.P.L. § 1921(1). The Maddoxes sued to collect that penalty and to represent a class of similarly wronged borrowers.

On review of the question certified for interlocutory appeal—whether the Maddoxes have Article III standing to sue the Bank for the statutory damages and other relief—we hold, first, that the invasion of interests protected by state law can support Article III standing, an issue that our court has not yet formally addressed. Although not every state law violation may give rise to an Article III injury in fact, the Supreme Court's teachings lead us to conclude that a state legislature, like Congress, may recognize legal interests whose violation resembles wrongs traditionally cognizable at common law such as to allow their vindication by wronged persons in federal court, provided other requisites of federal jurisdiction are met. *6

Next, we decide that the Maddoxes' complaint supports a plausible inference that the Bank's violation both (1) harmed their financial reputations during the nearly ten-month period of the Bank's noncompliance with the thirty-day filing deadline, and, relatedly, (2) created a material risk of particularized harm to them during that period by impairing their credit and limiting their borrowing capacity. These interests are protected by the state's statutory timely filing requirements and its imposition of a penalty payment obligation on the noncompliant bank to the wronged borrower. They reflect the state legislature's judgment that the interests are worthy of protection. The interests are similar to those traditionally actionable at common law, where defamation actions and slander of title suits gave

victims recourse. We think these are most appropriately viewed as substantive wrongs to the borrower and that no more than the Bank's noncompliance is needed to support the Maddoxes' claim of injury in fact.

But even if more is required for the Maddoxes to establish standing, the Bank's failure to record the mortgage discharge also posed a real risk of material harm to the Maddoxes because the public record showed them for an extended time, falsely, as owing more than $50,000 that they did not owe, which can *7 reasonably be inferred to have substantially restricted the Maddoxes' borrowing capacity.

In sum, considering these particularized actual harms and risks of harm and their general recognition in the common law, the Maddoxes have Article III standing to pursue their claims.

Accordingly, we remand for further proceedings.

# BACKGROUND

## I. The Complaint's allegations.

The Maddoxes' complaint alleges the following facts, which we accept as true for purposes of this appeal. *See, e.g., Lynch v. City of New York*, 952 F.3d 67, 75 (2d Cir. 2020).

On October 6, 2000, sisters Sandra Maddox and Tometta Maddox Holley entered into a mortgage loan with Aegis Mortgage Corporation ("the Loan"). The mortgage and assignment were recorded with the Erie County Clerk's Office. The mortgage encumbered the Maddoxes' property at 149 Hampshire Street, Buffalo, New York 14213 (the "Property"). The Loan was later assigned to BNY Mellon. In September 2014, the Maddoxes sold the Property to two individuals who are not parties to this suit. *8

On or about October 5, 2014, the Loan was paid off and the debt discharged. However, BNY Mellon failed to file a satisfaction of mortgage with the Erie County Clerk's Office until nearly one year later on September 22, 2015.

By its failure to record the discharge within thirty days of payment, BNY Mellon violated New York's mortgage-satisfaction-recording statutes. These require the mortgage lender, within thirty days of the full repayment of the debt, to present a certificate of discharge to the county clerk for filing. *See* R.P.L. § 275(1) (requiring timely presentation of certificate and imposing monetary penalties for noncompliance); R.P.A.P.L. § 1921(1) (same).

## II. Procedural history.

On December 15, 2015, approximately three months after BNY Mellon had recorded the satisfaction, the Maddoxes brought a class action suit against BNY Mellon for violation of New York's mortgage-satisfaction-recording statutes.

In late 2016, after the Supreme Court issued its decision *Spokeo Inc. v. Robins*, 136 S. Ct 1540 (2016), BNY Mellon moved to dismiss on the pleadings for lack of standing. It argued—among other things—that the Maddoxes lack Article III standing to pursue the stated claim, asserting that the Maddoxes "suffered no actual damages in relation to the alleged failure to record the satisfaction" and *9 therefore "failed to plead a concrete harm" under *Spokeo. Maddox v. Bank of N.Y. Mellon Tr. Co.*, No. 15-cv-01053, 2017 WL 449962, at *2 (W.D.N.Y. Jan. 30, 2017) (Report and Recommendation ("*R&R*")) (citing Bank's Memorandum). The Bank did not dispute that the discharge was untimely filed.[1]

> [1] It did argue, however, that it was associated with the Maddoxes' mortgage only as a trustee and therefore had no liability. The district court rejected that argument, and the issue is not part of the question certified for interlocutory appeal. *Maddox v. Bank of N.Y. Mellon Tr. Co.*, No. 15-cv-01053, 2018 WL 3544943, at *5 (W.D.N.Y. July 24, 2018).

The Maddoxes countered that the Bank's ten-month period of noncompliance with the statute impaired access to accurate financial information

about them and created a false impression about their credit status during this period. Because the right to be free of these harms was recognized by the state legislature and bears a strong relationship to harms traditionally actionable at common law, the violations cause substantive harms and otherwise create concrete injuries that endow the Maddoxes with standing to seek remedies in federal court, they urged. The Maddoxes further argued that the Bank's violation of the mortgage-satisfaction-recording statutes for an almost eleven-month period (ten months later than the statutes permit without penalty) caused them a sufficiently real risk of other concrete and

10 particularized harms—failure to obtain *10 financing for other properties and damage to personal credit, for example—that those risks too gave rise to an injury in fact supporting their Article III standing to sue.[2]

> [2] In conjunction with their opposition to the Bank's motion, the Maddoxes submitted an affidavit made by Tometta Maddox Holley attesting to the loss of time, legal expenses, and adverse emotional effects that she suffered as a result of the belated filing, which she learned about some time before the satisfaction was finally filed. Her attestations were not the subject of allegations in the complaint and were not the basis for the district court's ruling. They also do not bear on our analysis of the Maddoxes' standing.

A magistrate judge issued a Report and Recommendation suggesting that the district court deny the motion to dismiss. *R&R*, 2017 WL 449962, at *4. The district court accepted the recommendation and denied BNY Mellon's motion for judgment on the pleadings. *Maddox v. Bank of N.Y. Mellon Tr. Co*., No. 15-cv-01053, 2018 WL 3544943, at *2 (W.D.N.Y. July 24, 2018). It held that the Bank's violation was a "procedural violation," and because the Bank's violation of the mortgage-satisfaction-recording statutes created a "material risk of harm" to them,[3] the Maddoxes' allegations of noncompliance by

11 the bank satisfied the *11 injury-in-fact requirement for Article III standing. *Id*. The district court reasoned that failure to timely record a mortgage satisfaction could cloud title to real property, inhibit sale of the property, and affect the mortgagor's credit.

> [3] In holding that "a violation of the statutes, without any further tangible harm, gives rise to an Article III injury-in-fact," the district court discussed the Bank's violations as presenting a "material risk of harm," a "risk of real harm," and a "sufficient degree of real risk" to the Maddoxes. *Id*. at *1-2. The Supreme Court in *Spokeo* treated similar formulations as synonymous, 136 S. Ct. at 1543, 1547, 1549-50, and we do the same.

At the same time, the district court took note of the Eleventh Circuit's contrary decision in *Nicklaw v. Citimortgage, Inc*., 839 F.3d 998 (11th Cir. 2017), *reh'g en banc denied*, 855 F.3d 1265 (2017), and a footnote in our decision in *Strubel v. Comenity Bank*, 842 F.3d 181, 194 n.15 (2d Cir. 2016), that cites *Nicklaw* with apparent approval. It accordingly identified the question as a close one and on that basis certified the question for interlocutory appeal. We accepted the certification, and we now address that question.

## DISCUSSION

We review a district court's decision regarding judgment on the pleadings de novo. *Lanning v. City of Glens Falls*, 908 F.3d 19, 24 (2d Cir. 2018).

Article III standing requires plaintiffs to show (1) an "injury in fact," (2) a "causal connection" between that injury and the conduct at issue, and (3) a likelihood "that the injury will be redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992) (internal

12 quotation marks omitted). *12 The central question on appeal is whether the Maddoxes have met the injury-in-fact requirement.

"To demonstrate injury in fact, a plaintiff must show the invasion of a [1] legally protected interest that is [2] concrete and [3] particularized and [4] actual or imminent, not conjectural or hypothetical." *Strubel*, 842 F.3d at 188 (internal quotation marks and citation omitted; bracketed numbers added). BNY Mellon argues that, although the New York State Legislature may have implicitly recognized that delayed recording can create harms such as clouding title and adversely affecting a mortgagor's credit, the Maddoxes have not alleged, and cannot allege, that they suffered from these harms. Therefore, BNY Mellon asks us to conclude that the Maddoxes have not shown that the injury alleged was concrete and particularized. As a result, BNY Mellon contends, the Maddoxes' injury from the discharge's late recordation was neither "concrete" nor "particularized" enough to amount to an injury in fact for purposes of Article III standing. The Maddoxes reject this analysis, urging that where the Legislature has recognized a legal interest or interests and a plaintiff has suffered a harm or risk of real harm to those interests, Article III is satisfied. According to the Maddoxes, the harms that the Legislature aimed to preclude need not have come *13 to fruition for a plaintiff to have suffered a material risk of real harm sufficient to seek the statutory remedy afforded by the Legislature. We discuss these arguments below.

*14

### I. State legislatures can create "legally protected interests" whose violation satisfies Article III's injury-in-fact requirement.

At the threshold, we must address the general question whether the New York State Legislature has the power to create legal interests whose violation can satisfy Article III. No party disputes that it may and the judicial consensus so holding is strong, but we have not yet squarely addressed the question. For the reasons surveyed briefly below, we hold that a state legislature, like Congress, may

recognize such a legal right. By so holding, we join the other circuits to have considered the question.[4]

> [4] *See Bryant v. Compass Grp. USA, Inc.*, 958 F.3d 617, 621 (7th Cir. 2020), *as amended on denial of reh'g and reh'g en banc* (June 30, 2020); *Cottrell v. Alcon Labs.*, 874 F.3d 154, 164 (3d Cir. 2017); *Utah ex rel. Div. of Forestry, Fire & State Lands v. United States*, 528 F.3d 712, 721 (10th Cir. 2008); *Cantrell v. City of Long Beach*, 241 F.3d 674, 684 (9th Cir. 2001). We are aware of no Circuit holding to the contrary.

The Supreme Court has consistently found Article III's injury-in-fact requirements of concreteness and particularity can be satisfied in cases arising from the violation of federal statutes that confer legal interests on individuals. *See, e.g., Spokeo*, 136 S. Ct. at 1544, 1549 (Fair Credit Reporting Act);[5] *Fed. Election *15 Comm'n v. Akins*, 524 U.S. 11 (1998) (Federal Election Campaign Act); *Public Citizen v. Dep't of Justice*, 491 U.S. 440, 449 (1989) (Federal Advisory Committee Act); *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 373 (1982) (Fair Housing Act); *Trafficante v. Metropolitan Life Insurance Co.* 409 U.S. 205 (1972) (Civil Rights Act of 1968).[6] Following this lead, the courts of appeals and district courts have done so as well, most recently applying the standards articulated by the Supreme Court in *Spokeo* for discerning a "concrete," if sometimes intangible, injury. *Spokeo*, 136 S. Ct. at 1549-50. *See, e.g., Melito v. Experian Mktg. Sols., Inc.*, 923 F.3d 85, 93 (2d Cir. 2019) (Telephone Consumer Protection Act conferring right not to receive spam texts); *Cohen v. Rosicki, Rosicki & Assocs.*, 897 F.3d 75 (2d Cir. 2018) (Fair Debt Collection Practices Act conferring right to receive information); *Strubel*, 842 F.3d at 188 (Truth in Lending Act conferring right to receive information). We see no basis to conclude that state legislatures lack the power that Congress enjoys to recognize or create legally protectible interests whose invasion gives rise to Article III

16 standing, subject to the same general limitations that the Supreme *16 Court has alluded to with respect to Congress's ability to do so.[7] *See Lujan*, 504 U.S. at 572-78.

> 5 On remand, the Ninth Circuit in *Spokeo* concluded that Robins had adequately alleged both a concrete and a particular interest for Article III purposes, and so it found that he had standing to sue. *Robins v. Spokeo, Inc.*, 867 F.3d 1108, 1118 (9th Cir. 2017), *cert. denied*, 138 S. Ct. 931 (2018).

> 6 *See generally Linda R.S. v. Richard D.*, 410 U.S. 614, 617 n.3 (1973) ("Congress may enact statutes creating legal rights, the invasion of which creates standing, even though no injury would exist without the statute.").

> 7 Some federal statutes, we have concluded, do not confer such rights. *See, e.g., Crupar-Weinmann v. Paris Baguette America, Inc.*, 861 F.3d 76, 81 (2d Cir. 2017) (no injury in fact from procedural violation of federal Fair and Accurate Credit Transactions Act).

We reach this decision due to two general considerations embedded in Article III standing jurisprudence and highlighted by the Supreme Court in *Spokeo*: first, the long history of the adjudication in federal courts of state-created rights, under the courts' diversity jurisdiction, and second, the significant absence of the separation of powers concerns that arise when federal courts are called on to adjudicate congressionally created rights. 136 S. Ct. at 1547, 1549.

As to the first: The Supreme Court has regularly turned to "history and tradition" as "a meaningful guide to the types of cases that Article III empowers federal courts to consider." *Sprint Commc'ns Co., L.P. v. APCC Services, Inc.*, 554 U.S. 269, 274 (2008). The suggestion is therefore unsurprising that a state legislature's power to create rights whose invasion is cognizable as an Article III cases or controversy is virtually self-

evident. *See, e.g., Diamond v. Charles*, 476 U.S. 54, 65 n.17 (1986) (commenting that "[t]he Illinois Legislature, of course, has the *17 power to create new interests, the invasion of which may confer standing."). Indeed, state-created or state-recognized legal interests—both those with statutory and common law roots—provide the basis for Article III standing in cases invoking a federal court's diversity jurisdiction and supplemental jurisdiction over state-law claims.[8]

> 8 *Accord Cantrell*, 241 F.3d at 684; *FMC Corp. v. Boesky*, 852 F.2d 981, 993 (7th Cir. 1988); *see also Sprint Commc'ns Co.*, 554 U.S. at 283-8 (noting that state substantive law has historically controlled Article III standing determinations in cases involving the assignment of legal claims and collecting cases).

Second, as we note above, our holding is supported by the observation that a state legislature's power to create rights whose invasion gives rise to injuries-in-fact does not raise federal separation-of-powers concerns. "[S]tanding is built on a single basic idea—the idea of separation of powers." *Allen v. Wright*, 468 U.S. 737, 752 (1984); *see also Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013) ("The law of Article III standing, which is built on separation-of-powers principles, serves to prevent the judicial process from being used to usurp the powers of the political branches.") Unlike in a federal court's consideration of the judicial role in enforcing statutory rights created by Congress, separation-of-powers-concerns among the federal branches of government are not put at issue *18 by a plaintiff who seeks vindication in federal court of private rights created by state statute or state common law. Here, although other dynamics beyond Article III standing doctrine might be relevant, the adjudication by federal courts of rights created by state legislative action poses no obvious threat to the executive and legislative branches of the federal government.[9]

9 Actions seeking to have courts strike down federal or state statutes, rather than vindicate rights created by them, are generally seen as posing standing questions of a different nature. *See generally* William A. Fletcher, The Structure of Standing, 98 Yale L.J. 221, 250-51 (1988).

Consequently, we treat the rights created by acts of Congress and those created by acts of state legislatures in parallel for purposes of determining whether a plaintiff has suffered an actionable intrusion on a legally protected interest as a "case" or "controversy." We afford state-created rights no less weight in considering a plaintiff's standing than we do the invasion of a federally created right, subjecting them both to similar deference and similar limitations.[10]

10 That "standing in federal court is a question of federal law, not state law" supports our holding that rights created by state and federal law are subject to the same Article III standards. *Hollingsworth v. Perry*, 570 U.S. 693, 715 (2013).

## II. The Maddoxes have alleged injury in fact sufficient to satisfy Article III.

### A. The New York mortgage-satisfaction-recording statutes create a "legally protected interest." *19

19

We turn now to examining the private legal interests that are created by the state laws at issue in the Maddoxes' suit.

The New York mortgage-satisfaction-recording statutes require that the mortgagee "present a certificate of discharge for recording" to the applicable county clerk within thirty days of the mortgage loan's discharge. *See* R.P.L. § 275 ("Certificate of discharge of mortgage required"); R.P.A.P.L. § 1921 ("Discharge of mortgage"). They further provide that failure to timely present the certificate for recording "shall result in the mortgagee being liable to the mortgagor" for penalties in amounts ($500, $1,000, and $1,500), that increase as the mortgagee's tardiness increases

from more than 30, 60, and 90 days past the discharge date. R.P.L. § 275(1). In this way, the New York State Legislature statutorily conferred certain legal rights on mortgagors: the right to the mortgagee's timely recording of a discharge and the liability of the mortgagee to the mortgagor for monetary penalties in cases of delayed recording.

The judgment of the Legislature confirms as much. *See Spokeo*, 136 S. Ct. at 1549. As revealed by the mortgage-satisfaction-recording statutes' legislative history, the New York Legislature viewed lenders' failure to timely record *20 mortgage satisfactions as a "serious" problem. Joint App'x 104 ("The measure is a response to the serious issues that can arise when a certificate of discharge is not filed for a mortgage that has been paid off."); *see also id.* 111, 120. Although the record is sparse, it is not difficult to imagine that the Legislature would be interested in forestalling widespread practice in the state of untimely recording by providing incentives against untimely recording. Its interest might have had manifold sources—for example, ensuring the reliability of the state land recording system—but the record supports the view that state representatives enacting this legislation were concerned with traditionally actionable harms to mortgagors that arise from late recordings of discharge.[11] For instance, the legislative history emphasizes that problems with discharge of paid mortgages *21 were "often discovered" and "frequent" prior to legislative action, and that monetary penalties were established as part of R.P.L. § 275(1) and R.P.A.P.L. § 1921(1) as an "attempt[] to address this problem." Joint App'x 99, 104-05, 111, 123-24, 127; *see also id.* 104, 120 (New York Bill Jacket) (considering a borrower's recording of mortgage discharge to be "just as important" as a lender's recording of mortgage). We thus conclude that the New York Legislature intended to create legally protected interests that, if violated, would permit individuals to seek judicial redress.

20

21

11 The dissent objects that it is "pure assumption, and faulty," to find that the New York Legislature enacted the mortgage-satisfaction-recording statutes to protect mortgagors and reasons from this criticism that mortgagors' claim to a protectible legal interest fails. Dissent at 3. With respect, we disagree. Although we do not dispute that one purpose of §§ 275 and 1921 may have been to "induce lending institutions to keep records up to date," *id.*, and that the statutes' prescribed penalties may incentivize compliance by lenders, these observations do not negate the existence of a protectible legal interest for mortgagors created by the statute. After all, it is a mortgagor who has the most to lose from a Bank's failure to file a discharge, a fact supported by R.P.A.P.L. § 1921, which provides borrowers with an avenue for judicial relief that can lead to directives requiring negligent lenders to file discharges.

**B. Violation of New York's mortgage-satisfaction-recording statutes produces a "concrete" injury regardless of whether those statutes create "substantive" or "procedural" rights.**

To support standing, an injury must be "real, and not abstract"—it must be "concrete." *Spokeo*, 136 S. Ct. at 1548 (internal quotation marks and citation omitted). "A 'concrete' injury must be '*de facto*'; that is, it must actually exist" and not be "speculative." *Id.* (citation omitted). "Concrete" harms are not limited to "tangible injuries," however; they may be intangible, such as reputational harms, *id.* at 1549. Further, such intangible harms need not be particularly burdensome, as we recognized just recently. *See* 22 *Melito*, 923 F.3d at 92-94. *22

Navigating the vocabulary of standing-related injuries can be treacherous, as illustrated by the language quoted just above. To determine whether statutorily created rights protecting against intangible harms satisfy the "concreteness"

requirement, *Spokeo* suggests that courts consider whether the rights at issue are substantive or procedural in nature. 136 S. Ct. at 1549. Informed by *Spokeo*'s model, we examine the historical roots of the harms protected against by the mortgage-satisfaction-recording statutes to assess whether the rights are better characterized as one or the other, recognizing still that legislative rights are not reliably subject to the dichotomy. *See Strubel*, 842 F.3d at 189 (looking to the interest protected by the legislatively created right, rather than how that right is characterized); *Cohen*, 897 F.3d at 80-81 (same). Evaluating the rights to timely recording that are conferred by these state statutes, however, we conclude that the rights and the injuries arising from their alleged violation are better characterized as substantive than procedural, and that their violation satisfies the "concrete injury" requirement.

**1. The mortgage-satisfaction-recording statutes create a substantive right, the violation of which produces a concrete, intangible harm.** 23 *23

Under the injury-in-fact inquiry, a statutory right is said to be "substantive" if it protects against an "alleged intangible harm [that] has a close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts." *Spokeo*, 136 S. Ct. at 1549. If a statute protects against a harm bearing a "close relationship" to a harm traditionally recognized at common law, the harm alleged due to a violation of that statute constitutes a concrete injury in fact sufficient to establish Article III without any additional showing. *Id*.

As described above, in R.P.L. § 275 and R.P.A.P.L. § 1921, the State Legislature obligated lenders to timely file mortgage satisfactions and gave borrowers rights to claim a penalty payment in designated amounts for the mortgagee's failure to comply. As the Maddoxes persuasively argue, the intangible rights that the mortgage-satisfaction-recording statutes seek to protect and

the concurrent injury from the Bank's violation of the statutes—*i.e.*, the delay in recording a mortgage satisfaction—"has a close relationship to [multiple] harm[s] that ha[ve] traditionally been regarded as providing a basis for lawsuit in English or American courts." *Spokeo*, 136 S. Ct. at 1549. *24

24

First, a lender's delay in recording the satisfaction of a mortgage typically creates a cloud on title of real estate. New York common law has long recognized actions to clear a clouded title as "'an ancient and proper remedy.'" *Bellino v. JPMorgan Chase Bank, N.A.*, 209 F. Supp. 3d 601, 609 (S.D.N.Y. 2016) (quoting *Greenberg v. Schwartz*, 73 N.Y.S. 2d 458, 459 (N.Y. Sup. Ct. 1947)). As such, *Spokeo* instructs that New York's satisfaction-of-mortgage statutes create a substantive legal right, the violation of which creates an injury in fact.

In addition, the right to timely recordation of discharge has close ties to traditional reputation-based harms actionable at common law. A mortgage recorded with the county clerk conveys to the world that the borrower owes a debt secured by a property. Correspondingly, a lender's delay in recording a mortgage satisfaction creates the false appearance that the borrower has not paid his debt. This harms the borrower's reputation by, among other things, making him look less creditworthy than he is. This type of reputational harm—*i.e.*, one that flows from the publication of false information—is well established as actionable at common law. *See Weldy v. Piedmont Airlines, Inc.*, 985 F.2d 57, 61-62 (2d Cir. 1993) (discussing elements to establish *prima facie* claim of slander); *see also Spokeo*, 136 S. Ct. at 1549 (noting libel and slander per se as being actionable). *25 History therefore weighs in favor of treating violations of the satisfaction-of-mortgage statutes as concrete Article III injuries.

25

The penalty payment required of the mortgagee *to the mortgagor* is a meaningful substantive feature of the state law. *See* R.P.L. § 275(1) ("Failure by a mortgagee to present a certificate of discharge for recording shall result in the mortgagee being liable to the mortgagor . . . ."); R.P.A.P.L. § 1921(1) (same). The mortgagee's failure to timely file a certificate of discharge does not create an obligation owed to the public fisc. We understand this component to signal the Legislature's intention to compensate the mortgagor for the harms it presumes may be suffered by a delay in recording the discharge of the mortgage debt: as identified by the district court, the cloud on title and the adverse effects on the borrower's credit reputation as well as on its ability to obtain financing. If the reliability of state records alone were at issue, one might expect the Legislature to have made the penalty payable directly to the state. Instead, the Legislature chose to make the penalty payable to the mortgagor. It also chose to provide a modest incentive to the lender to file discharges in a timely way.

In light of these considerations, we view the satisfaction-of-mortgage statutes as substantive provisions that protect concrete interests of a type traditionally recognized and protected at common law—not mere "procedural" rights which, if violated, must be accompanied by further allegations of harm before a concrete injury is established.

26   *26

For this reason, the Maddoxes need allege no harm greater than that their discharge was untimely recorded—the invasion of their statutory right under New York law—to establish a concrete, intangible injury of the sort that gives them Article III standing to sue for the statutory penalty in federal court, if other aspects of their asserted action, brought in part under the Class Action Fairness Act, Pub. L. No. 109-2, 119 Stat. 4 (2005), withstand scrutiny.[12]

---

[12] For the ordinary borrower, untimely recording of a discharge can also be expected to create and sustain an actionable cloud on title to the property securing the discharged mortgage debt. Long delayed filings can result in the

borrower having to pay a duplicative filing fee for the discharge: once at closing and once when the discharge is actually filed. The Maddoxes did not suffer such harms, however, and did not risk such harms, because conveyance of the Property was completed several weeks before the mortgage satisfaction occurred.

### 2. The Maddoxes alleged a concrete injury in fact even if the satisfaction statutes create only a procedural right.

Even were we to characterize the satisfaction-of-mortgage statutes as "procedural" (as the district court did) rather than substantive, we would still 27 *27 hold that the Maddoxes have established a concrete injury for Article III purposes. Although under *Spokeo*'s teachings "a bare procedural violation, divorced from any concrete harm" does not satisfy the injury-in-fact requirement of Article III, "the violation of a procedural right granted by statute can be sufficient in some circumstances to constitute injury in fact," such as when the violation presents a "material risk of [concrete] harm." 136 S. Ct. at 1549-50. Tellingly here, the Supreme Court has instructed that "a plaintiff in such a case"—that is, where a material risk of concrete harm is presented—"need not allege any *additional* harm beyond the one [the legislature] has identified." *Id.* at 1549; *see also Strubel*, 842 F.3d at 189. The threatened harm here satisfies Article III, even if the threat did not eventuate.

During the Bank's ten-month delay in recording the discharge of more than $50,000 in debt, BNY Mellon's violation presented a real risk of material harm to the Maddoxes of the type that the legislation would be expected to protect against. In particular, the inference is reasonable that the delay adversely affected the Maddoxes' credit during that time, making it difficult to obtain financing had they needed it in an emergency, and 28 even if they did not attempt *28 to borrow, leaving a false public record of indebtedness.[13] Because a mortgagee's violation of the mortgage-satisfaction-recording statutes by itself gives rise

to a risk of real harm, a mortgagor need not allege any further harm to meet the concrete-injury requirement. Regardless, the Maddoxes in fact suffered impaired credit during those ten months 29 in which their discharge unlawfully went *29 unrecorded, the public record falsely showing they bore over $50,000 of debt. If more is needed, and as discussed in the margin, they risked not being able to borrow during that time in the event of an emergency or for a new home. The Maddoxes' financial reputation (even apart from their ability to borrow) was also impaired during the ten-month delay because public records erroneously showed the discharged debt as unpaid. And, although they themselves did not suffer this harm, the ordinary mortgagor would have suffered a cloud on the title to his property from the Bank's failure, thereby causing a material risk of impeding any transaction concerning the subject property.[14]

> [13] The dissent challenges our conclusion on the basis that "[t]he Maddoxes never suffered a cloud on title prohibiting them from selling their property, or adverse effects on their credit, or an inability to finance another property, or even a risk of these harms." Dissent at 12. We agree that the Maddoxes were never exposed to the risk of being unable to sell their property, as they sold the relevant property before satisfying their mortgage. However, the Maddoxes were nonetheless exposed to the risks of having their credit adversely affected or being unable to obtain financing for other property, should the need to have arisen. Other courts have recognized that "plaintiffs could have realized that harm if they had, for example, . . . tried to finance another property and been subjected to a credit check." *Bellino v. J.P. Morgan Chase Bank, N.A.*, 209 F. Supp. 3d 601, 607 (S.D.N.Y. 2016); *Jaffe v. Bank of America, N.A.*, 197 F. Supp. 3d 523, 528 (S.D.N.Y. 2016). *See also Weldon v. MTAG Svcs., LLC*, No. 3:16-cv-783 (JCH), 2017 WL 776648, at *6 (D. Conn. Feb. 28,

2017); *Bowman v. Wells Fargo Bank, N.A.*, Case No. 14-cv-648, Dkt. 125 (S.D.N.Y. Jan. 25, 2017); *Villanueva v. Wells Fargo Bank, N.A.*, 13-CV-5429 (CS) (LMS) (S.D.N.Y. Jan. 25, 2017); *see also Nicklaw v. Citimortgage, Inc.*, 855 F.3d 1265, 1273 (11th Cir. 2017) (Martin, *J.*, dissenting from denial of rehearing en banc) ("[A] mortgage holder who does not record the satisfaction of a mortgage can seriously impact a person's credit, . . . ."); AARP/NCLC Amicus Br. at 23 (noting that "untimely recording of mortgage satisfactions foreseeably result[s] in significant problems, such as lowered credit scores or credit denials"). A standing rule requiring that, to collect the statutory damages imposed for late filing, a victim of long delayed discharge apply for and be denied a loan, seems to us to create an unwarranted barrier to the penalty payment mechanism that the Legislature adopted. Indeed, such a barrier would make the courts an impediment to, rather than facilitator of, the functioning of a reasonable legislative scheme.

14  It can reasonably be inferred that, during the period of delayed recordation, the Maddoxes' credit was adversely affected, and to a significant extent. At the very least, a false and materially less favorable financial profile about the Maddoxes was in the public record during that time, thanks to the Bank. As discussed above, that false record necessarily exposed them to the real and material risks of having their credit score adversely affected and of being unable to obtain financing for the purchase of another property or to borrow in an emergency. We fail to understand how these are not real and material risks that result from the unlawful invasion of a private right and are sufficient to confer Article III standing. *See Spokeo*, 136 S. Ct 1548-49; *see also id.* at 1553 (Thomas, *J.*, concurring) ("A plaintiff seeking to vindicate a statutorily created private right

need not allege actual harm beyond the invasion of that private right." (citations omitted)).

## C. The Bank's factual objections and counterarguments are not persuasive. *30

**1. Factual objections.** BNY Mellon does not challenge the district court's conclusion that violation of the New York mortgage-satisfaction-recording statutes exposes a mortgagor to harms such as clouding title, which can encumber the property or hinder the mortgagor's ability to sell it, or by adversely affecting the mortgagor's credit, which can make it difficult for the mortgagor to obtain financing. Rather, BNY Mellon contends that the Maddoxes neither suffered actual harm nor faced a material risk of harm because the procedural violations at issue were remedied months before the Maddoxes brought suit and the Maddoxes sold their property while the mortgage still encumbered it. As such, BNY Mellon argues that the Maddoxes have alleged nothing more than a bare procedural violation, which is insufficient on its own. Its arguments fail to persuade us.

First, as to the facts alleged. Even though the Maddoxes were able to sell the Property without the Bank having recorded the discharge, the Property remained burdened by the undischarged lien and the Maddoxes remained potentially exposed to liability to their buyers for that encumbrance during the lien's near eleven-month wrongful pendency. In addition, the Maddoxes bore the liability for the loan on their credit report during those eleven months. Their *31 ability to borrow could reasonably be expected to have been limited by that perceived liability.

Further, apart from the practical effects of such a limitation, as discussed above, their reputation for creditworthiness was affected adversely by the Bank's failure to record the discharge until ten months after the statutory deadline. As we have posited and as the State Legislature seemed to acknowledge by its actions, these are not mere procedural harms; they are substantive, and

actionable, regardless of whether the Maddoxes in fact lost a house purchase or loan as a result. *See Donoghue v. Bulldog Inv'rs Gen. P'ship*, 696 F.3d 170, 177-78 (2d Cir. 2012) (violation of statutorily created "interest in maintaining a reputation of integrity, an image of probity" sufficient to establish Article III injury (internal quotation marks and citation omitted)). The Legislature's decision to give them a right to collect $1,500 from their noncompliant lender serves as an effective proxy for the risk and evinces a concrete harm. In keeping with this observation, the statute does not excuse the noncompliant lender from paying the borrower the statutory penalty if the borrower does not lose a loan or a sale as a result of the delay. The penalty is due if the filing is tardy. *32

**2. The import of *Strubel*.** BNY Mellon points to our decision in *Strubel v. Comenity Bank* as providing support for its position to the contrary. But our decision in that case supports our analysis that the Maddoxes have suffered an injury in fact. In *Strubel*, we addressed whether the plaintiff had standing to sue a bank for alleged violations of the Truth in Lending Act ("TILA"). 842 F.3d 181 (2d Cir. 2016). The plaintiff borrower sought damages from the defendant Comenity Bank based on allegations that, in connection with a loan made to her, the bank failed to make certain disclosures to her, in violation of TILA. *See id.* at 189. Her injury in all cases was the failure to receive information. We held this failure caused a concrete injury to support standing in some instances but not in others. *Id.* at 190.

For instance, Strubel did not have standing to challenge the bank's failure "to disclose a consumer's obligation to provide a creditor with timely notice to stop automatic payment of a disputed charge" because it was undisputed that the bank did not offer an automatic payment plan at the relevant time. *Strubel*, 842 F.3d at 191. As such, Strubel could not establish "any risk of harm at all" from the failure to make this disclosure. *Id.* at 192. *33

We also held that Strubel did not have standing to sue the bank "for failing clearly to advise her of its obligation . . . to acknowledge a reported billing error within 30 days of the consumer's communication" reporting the error and "to tell the consumer, at the same time, if the error ha[d] already been corrected." *Id.* at 192-93. Strubel conceded that she never reported any billing error and thus did not allege that the bank failed to respond to her within thirty days of a reported billing error as the statute required.

Strubel claimed injury still in the bank's failure to notify her of its obligation to respond within thirty days of any consumer's report of an error. *Id.* at 194. But this, we concluded, was a "bare procedural violation" that did not create a "material risk of harm" to her since it had no bearing at all on her situation. *Id.* at 193. "[T]he creditor-response obligations that are the subject of the required notice arise only if a consumer reports a billing error," we explained, and, as Strubel conceded, she had not done so. *Id.* The bank had thus violated no obligation to her.

In contrast, we decided that Strubel *did* have standing to challenge the bank's alleged failure to provide her with information about (1) "certain identified consumer rights" related to yet-unpaid credit card purchases, and (2) *34 the manner in which Strubel was required to contact the bank in instances where she was dissatisfied with a credit card purchase. *Id.* at 190. As we noted, the alleged failure to provide these notices caused Strubel a concrete, if intangible, injury, because those failures bore upon "'avoid[ing] the uninformed use of credit,' a core object of the TILA." *Id.* (quoting 15 U.S.C. § 1601(a)); *see id.* ("A consumer who is not given notice of his obligations is likely not to satisfy them and, thereby, unwittingly to lose the very credit rights that the law affords him."). We did not require, however, that the risk to Strubel's credit be actualized for her to have standing to enforce the statute against the bank.

Also significant in *Strubel*, we evaluated the risk created by statutory violations in part by looking at the plaintiff as a proxy for the general consumer: in assessing injury in fact, we also concluded that an "alleged defect in 30-day notice of correction[] [did] not, by itself, present any material risk of harm" to consumers generally. *Id.* at 193 (internal quotation marks and citation omitted). It was not "apparent that the challenged disclosure would have such an effect on consumers generally," we said, in rejecting the claim that the disclosure was of broader import. *Id.* In other words, in assessing standing, we could not "reasonably assume" that the challenged failure to disclose would create a *35 sufficient degree of risk of harm to Strubel or indeed to any consumer customer of the bank. *Id.* "While a consumer would undoubtedly appreciate prompt notification of such favorable action," we observed, "it is not apparent how a creditor's failure to tell the consumer that he will be so advised, by itself, risks real harm to any concrete consumer interest protected by the TILA." *Id.*[15]

[15] We observed in *Strubel* that our bifurcated analysis comported with that of other Circuits, including that of the Eleventh Circuit in *Nicklaw*. *See Strubel*, 842 F.3d at 194 n.15. We do not understand *Strubel*'s footnoted citation of *Nicklaw* to transform the Eleventh Circuit's decision into binding precedent for our Court, and we decline to adopt *Nicklaw*'s reasoning because it is in tension with our own Circuit's jurisprudence on standing.

BNY Mellon urges us to conclude based on *Strubel* that the Maddoxes suffered no injury in fact on the ground that any risk of harm to the Maddoxes did not then and cannot now materialize.[16] BNY Mellon reads *Strubel* as holding that a plaintiff lacks standing to seek statutory penalties and other relief for her creditor's failure to provide her certain statutory notices "unless the violation *36 results in 'actual harm' to the consumer, like an adverse alteration in

the consumer's credit behavior." Appellant's Br. at 14 (quoting *Strubel*, 842 F.3d at 190). We read *Strubel* otherwise.

[16] As discussed in the text, under our precedents, a plaintiff may adequately allege a "concrete" injury without establishing that a risk of harm to herself actually materialized. Nor need she show that the harm risked could still materialize at the time her lawsuit is filed. Rather, we look more broadly at whether the injury complained of presents a real risk of harm, without undertaking an especially demanding analysis into whether the risk of harm did, or could, materialize for the plaintiff before us. To do otherwise when Article III makes no such demand risks unnecessary judicial interference with a legislature's intention to remedy wrongs that it identifies.

The text of our decision in *Strubel* reveals that the plaintiff's generalized assertions of standing with regard to receiving information from the bank about a 30-day notice requirement did not fail because of an absence of allegations of actual harm to Strubel. Rather, it was the "absence of *any plausible claim* of *adverse effects* on [either] *consumer behavior [or her behavior]*" that did in these claims. *Id.* at 193 (emphasis added); *see also id.* (noting a lack of "risk[] [of] real harm to *any concrete consumer interest* protected by [the statute]" (emphasis added)). The point there was that no consumer—not Strubel herself, nor anyone else—was put at risk by the bank's failure to disclose its contingent obligation, because the contingency had no bearing on either Strubel or consumers generally.

In other words, Strubel lacked standing with respect to this violation because the alleged violation presented no conceivable risk of real harm to *any* consumer, including Strubel herself. We accordingly identify no conflict between *Strubel* and the rule that we articulate here: when analyzing a plaintiff's standing to sue for a statutory violation, we look to whether the real

37 harms that the statute *37 protected against were suffered and whether a risk of real harm was created by the defendant's violation, irrespective of whether the risk for the particular plaintiff bringing suit eventually evaporated.

**3. Our decision in *Cohen*.** Our decision in *Cohen v. Rosicki*, *Rosicki & Associates*, *P.C.*, 897 F.3d 75 (2d Cir. 2018), in which our Court addressed the standing of a plaintiff who alleged procedural violations of the Fair Debt Collection Practices Act ("FDCPA"), is especially instructive for these purposes.[17]

> 17 *See* F. Andrew Hessick, *Standing: Injury in Fact, and Private Rights*, 93 Cornell L. Rev. 275 (2008) (arguing that "requiring a showing a factual injury in private rights cases is ahistorical and . . . undermines the separation of powers by preventing the courts from guarding rights and by limiting Congress's power to create rights.").

In that case, the plaintiff, Cohen, received a foreclosure complaint resulting from an unpaid debt. *Id*. However, the complaint incorrectly identified the creditor to whom the debt was owed as Green Tree. *Id*. at 79. When Cohen submitted a "qualified written request" for more information on the debt, he learned that Fannie Mae, not Green Tree, owned the debt. *Id*. At this point, Cohen had been apprised of the proper creditor, and any harm ensuing from the mistake had been eliminated. Approximately three months after the correction was made, however, Cohen sued the law firm under the FDCPA, seeking *38 damages based on the firm's incorrect original identification of the creditor. *Id*. at 79-80.

Although Cohen knew the identity of the correct creditor at the time of suit, our Circuit held that Cohen had standing to pursue the law firm's noncompliance with the FDCPA in the incorrect original notice. We reasoned that the "misrepresentation might have deprived Cohen of information relevant to the debt prompting the foreclosure proceeding, posing a risk of real harm insofar as it could hinder the exercise of his right to defend or otherwise litigate that action." *Id*. at 81-82 (internal quotation marks omitted).

Notably, in our analysis we did not assess whether Cohen had actually been, or could still be, hindered in his response to the foreclosure action. Indeed, when addressing the merits of his claim, we explicitly held that "there is no indication that the identification of Green Tree . . . undermined Cohen's ability to respond to the debt collection." *Id*. at 86. Thus, our decision in *Cohen* indicates that, when addressing whether a plaintiff has Article III standing to sue on a statutory violation that seems procedural in nature, we will look only to whether the procedural violation created a "risk of real harm" to the plaintiff. That the *39 risk of real harm did not materialize for the plaintiff and had dissipated before suit was filed does not bear on our analysis.

Both *Cohen* and *Strubel* involve a consumer's informational rights, protected by a federal statute. These types of statutes, being highly detailed, and aiming to protect consumers by informing them, pose special challenges insofar as standing is concerned, and our decisions reflect these challenges. The New York satisfaction-of-mortgage statutes do something else altogether: they require that consumer borrowers be protected from delinquent lenders that fail to keep the public record up to date, recognizing that individual harm is directly caused by such failures. This is why we see the harm alleged by the Maddoxes here and addressed by the statute as of a different quality—substantive, not procedural—than those that are the focus of *Cohen* and *Strubel*, informative as those decisions are about the application of *Spokeo*'s standards. *Spokeo*'s dismissal of an action based on the credit agency's mistaken report of a consumer's zip code (a procedural error of sorts) bears little resemblance to a bank's allowing the authoritative public record to continue to reflect an ordinary consumer's $50,000 debt that has been repaid in full.

### III. The "particularization" and "actual or imminent" requirements. *40

40

In addition to a concrete injury, to support their Article III standing the Maddoxes must also allege that they have suffered a harm that is *particular* to themselves, and not just that the Bank has harmed the public interest. "For an injury to be 'particularized,' it 'must affect the plaintiff in a personal and individual way.'" *Spokeo*, 136 S. Ct. at 1548 (citation omitted); *id.* ("[A]n injury in fact must be both concrete *and* particularized." (emphasis in original)).

The Maddoxes have satisfied this requirement. As the district court ruled, "The failure to record a satisfaction . . . creates the appearance that a person's mortgage loan—one of the biggest debt[s] many people ever take on in their lives— has not yet been paid in full." 2018 WL 3544943, at *2 (internal citation and quotation marks omitted). The shadow that BNY Mellon's failure to record cast on the Maddoxes' credit record created a real risk of financial harm that affected the Maddoxes "in a personal and individual way." *Spokeo*, 136 S. Ct. at 1548.[18] This is sufficient to establish a "particularized" injury. *Id.*

[18]  The fact that the same type of injury may have caused personal harm to many others does not render the Maddoxes' injury any less particularized. *See id.* at 1548 n.7.

As to the "*actual or imminent*" requirement for an injury in fact, it is apparent (as we have discussed) that certain harms and the risk of other harms *41 were created when the satisfaction was not timely recorded.[19] Consequently, no additional "actual or imminent" injury need be asserted by the Maddoxes. *See id.* at 1552 (Thomas, J., concurring). As the Supreme Court in *Spokeo* recognized when it stressed that "a plaintiff . . . need not allege any *additional* harm beyond the one Congress has identified." 136 S. Ct. at 1549 (emphasis in original) (citations omitted); *see also id.* (citing Restatement (First) of Torts §§ 569, 570

41

(1938)). And as for the risk of harm, again, the risk need only be real and material: as discussed, it need not materialize.

[19]  The Bank appears to conflate the "particularized" and "actual or imminent" requirements. Neither the Supreme Court's nor our Court's precedents support treating these inquiries as synonymous.

Furthermore, it is our view that the "actual or imminent" requirement has most purchase in the standing analysis not in cases in which a legislature has created rights that a plaintiff wishes to vindicate, but in which prosecution under a statute is the harm from which a plaintiff seeks relief. *E.g.*, *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014); *Steffel v. Thompson*, 415 U.S. 452, 459 (1974). We think the factor merits no further discussion here, especially in light of our *42 conclusion that the Maddoxes suffered an actual harm to their substantive rights caused by the Bank's untimely recording.

42

Because the Maddoxes have satisfactorily alleged that they suffered an injury to a legally protected interest that is both concrete and particularized to them and actual, not speculative, they have established an injury in fact sufficient to support Article III standing.

### IV. Our dissenting colleague's additional objections.

**A. The relatively low dollar amount of the statutory penalties.** The dissent argues that the sums imposed as penalties for noncompliance are "arbitrary by design, and unmoored from any harm or risk to the mortgagor," and that this quality undercuts the view that the statute's violation causes injury in fact to a mortgagor. Dissent at 4. We disagree. First, the penalty seems to have been related to the filing fees that the bill's sponsor thought might be mistakenly twice imposed on a borrower if the lender did not timely file—they do not reflect an effort to quantify harm to borrowing ability, it is true, but they are not arbitrary. *See* Joint App'x 105-06, 121.[20] More

43  importantly however: in our view, *43 that the penalty amount is not keyed to the amount borrowed, the payoff amount, or some other borrower-specific calculation reflects only a legislative choice—to which we should defer— about nature and administration of the statutory scheme designed to give some recompense to the wronged borrower. That the penalties increase in amount as the delay is protracted is consistent with the notion that the longer the delay in recordation, the longer a mortgagor is exposed to the risks arising from the failure to record. The observation does not refute the view that the Legislature sought in part to protect mortgagors when it required timely recording or that mortgagors suffer harm or risk of harm by delay. To deny standing to a consumer borrower whose discharge has not been timely filed and yet who cannot point to a loan lost as a result is to impose yet more harm on the borrower who seeks the statutory penalty—or to deny recovery of the penalty altogether.

> 20  In New York, filing fees for mortgage discharges may vary on a county-by-county basis. *See* N.Y. C.P.L.R. § 8021(a).

**B. The absence of a provision for recovery by a class.** The dissent also seeks to cast doubt on the existence of a protectible legal interest by observing that the statute does not provide for or allow class-wide recovery of the penalties in state courts. Again, we are unmoved by the observation. The dissent is certainly correct that R.P.L. § 275 is

44  subject to the general provisions of New York *44 Civil Practice Law and Rules § 901(b), in which the State Legislature precludes the use of class action devices to recover "penalties" imposed by state law.[21] But R.P.L. § 275 and R.P.A.P.L. § 1921 do not themselves expressly preclude the use of the class action device. This is not to say that state law permits it, but merely to point out that the Legislature did not differentiate these penalties from others in its choices about recovery mechanisms.

> 21  N.Y. C.P.L.R. § 901(b) provides, "Unless a statute creating or imposing a penalty, or a minimum measure of recovery specifically authorizes the recovery thereof in a class action, an action to recover a penalty, or minimum measure of recovery created or imposed by statute may not be maintained as a class action."

Two additional observations support our view. First, the State Legislature did not attempt in any targeted way to prevent harmed individuals pursuing class relief in federal court. Rather, it gave no specific indication at all that it intended to circumscribe the relief available to a class of individuals who are harmed by a lender's practice of ignoring the obligation of timely filing. We doubt that it could have effectively done so, in any event. *See Shady Grove Orthopedic Associates, P.A. v. Allstate Insurance Co.*, 559 U.S. 393 (2010).

Second, that rights may not be vindicated as a class action by virtue of a general statute barring class actions has no legitimate bearing, we think,

45  on the *45 evaluation of whether plaintiffs suffer an injury in fact when the statute affording them that right is violated. The Supreme Court has consistently emphasized the irrelevance of the form of action to the constitutional question: "That a suit may be a class action . . . adds nothing to the question of standing." *Spokeo*, 136 S. Ct. at 1547 n.6 (internal quotation marks omitted); *Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996) ("The standing determination is quite separate from certification of the class."). Questions about potential aggregation of claims generally should have no bearing on the Article III standing inquiry: a state legislature may recognize a right whose invasion constitutes an injury in fact but may choose for administrative or other reasons to circumscribe the procedural mechanisms through which that right may be vindicated. Why that judgment should govern the actionability of an incursion on legal rights escapes us.

casetext

The need to separate the two inquiries—the assessment of injury in fact and any procedural limitations placed on vindicating of the challenged right—is illustrated, as the dissent recognizes, Dissent at 6-7, by the Supreme Court's ruling that a plaintiff suing on state-recognized rights may be entitled to pursue class actions in federal courts, even in the absence of a state provision for class-wide recovery. *Shady Grove,* 559 U.S. at 410, 415-16. Rather, the correct focus *46 of the legal-interest inquiry lies on whether the state or federal legislature, by statute, created a protectible legal interest. To allow generic state restrictions on class actions to inform federal analysis of a plaintiff's standing would to be enable an end-run around the Supreme Court's ruling in *Shady Grove.*

In any event, district courts have broad discretion in making class certification decisions and are better equipped to mitigate any related concerns arising in suits brought in federal court to vindicate state statutory rights. *See generally* Tobias Barrington Wolff, *Discretion in Class Certification,* 162 U. Pa. L. Rev. 1897 (2014). We see no need to import such an inquiry into questions of Article III standing.

## CONCLUSION

For the foregoing reasons, we affirm the district court's order denying BNY Mellon's motion for judgment on the pleadings and remand the case for further proceedings. *47 DENNIS JACOBS, Circuit Judge, dissenting:

The single claim in this case is for the $1500 penalty that New York allows an individual to collect from a bank if it delays the filing of a satisfaction of mortgage. Plaintiffs are claiming that such a delay ensued after they paid off their mortgage at the time they sold their house. I respectfully dissent because the claim does not support the jurisdictional requisite of concrete injury.

I agree with the majority opinion to the extent that a state legislature *can* create a legal interest that would support Article III standing when violated,

but only if a plaintiff's resulting harm or risk of harm would amount to a concrete injury. Here, the New York legislature has not done so: the harm of late filing befalls the system of recordation. The majority glides over this point—as well as the obvious point that sellers Sandra Maddox and Tometta Maddox Holley suffered neither the harm nor risk of harm required for concrete injury. In doing so, the majority concededly creates a circuit split. See Nicklaw v. CitiMortgage, Inc., 839 F.3d 998 (11th Cir. 2016).

The only facts that matter are few: the plaintiffs paid off their mortgage when they sold their house; the bank filed the mortgage satisfaction nearly one year afterward. By statute, New York creates a private right to collect an *48 escalating cash penalty if the satisfaction is filed more than 30 days after the mortgage is paid off, up to $1500 for delay exceeding 90 days. See N.Y. Real Prop. Law § 275; N.Y. Real Prop. Acts. Law § 1921 (the "statutes"). That's it.

Since the $1500 bounty is procedural in character, I start my analysis there. The majority also contends that there is a substantive right at issue; I discuss that later.

## I

The violation of a procedural right created by statute to protect individuals' underlying interests may in itself manifest concrete injury if (but only if) it "demonstrate[s] a sufficient 'risk of real harm' to the underlying interest to establish concrete injury without 'need [to] allege any *additional* harm beyond the one [the legislature] has identified.'" Strubel v. Comenity Bank, 842 F.3d 181, 189 (2d Cir. 2016) (second alteration in original) (quoting Spokeo, Inc. v. Robins, 136 S. Ct. 1540, 1549 (2016)). Absent that "connection between [the] procedural violation and a concrete interest," a violation of the right entails no concrete injury. Id. To see if there is a concrete injury, "a court properly considers whether [the legislature] conferred the procedural right in order to *49 protect an individual's concrete interests."

Id. (citing Summers v. Earth Island Inst., 555 U.S. 488, 496 (2009); Lujan v. Defs. of Wildlife, 504 U.S. 555, 572 n.7 (1992)).

The majority opinion takes for granted that the New York legislature enacted the statutes to protect mortgagors from concrete harm. But this is pure assumption, and faulty at that. The legislature itself explained the legislative purpose, which is not to compensate individuals for harm: it is "[t]o [e]nsure that a certificate of discharge of mortgage is properly and timely issued and to impose a penalty on the lending institution or person(s) holding the mortgage for failing to do so." N.Y. Bill Jacket, 2005 S.B. 48, Ch. 467. I do not doubt that a late filed satisfaction might cause real harm, or that the statutes would be useful in a suit against a bank for such harm as might actually arise. But failure to comply does not in itself amount to a concrete harm. The statutes operate to *penalize* a lending institution for delaying recordation of a mortgage satisfaction—not to *compensate* a mortgagor for such a delay.

The New York legislature enacted the statutes to induce lending institutions to keep public records up to date; and the penalty payable to bank customers is an incentive for enforcement that is needed for the very reason that *50 ordinarily the mortgagor would lack an injury on which to premise a claim. The escalating penalties are therefore arbitrary by design, and unmoored from any harm or risk to the mortgagor: $500 for failure to record after 30 days; $1,000 after 60 days; and $1500 after 90 days.[22] See N.Y. Real Prop. Acts. Law § 1921; N.Y. Real Prop. Law § 275.

[22] The majority concedes that the penalties "do not reflect an effort to quantify harm to borrowing ability." Maj. Op. at 43. Apparently, the majority's view is that the legislature sought to protect mortgagors from adverse effects on credit, yet designed a penalty system around a different harm altogether (twice-imposed filing fees).

The majority opinion excerpts legislative history explaining that "the measure is a response to the serious issues that can arise when a certificate of discharge is not filed for a mortgage that has been paid off." Maj. Op. at 20 (quoting N.Y. Bill Jacket, 2005 S.B. 48, Ch. 467). However, the quoted passage, read in full, emphasizes the need for county records to afford reliable notice; and the text states expressly that "[t]he legislation provides a remedy to ensure this takes place"; and though it posits the (trivial) harm that might befall a person who later sells the property and may need to pay a second filing fee, even that inconvenience could not befall someone who, like the Maddoxes, already sold:

> The measure is a response to the serious issues that can arise when a certificate of discharge is not filed for a mortgage that has been paid off. A fee for this document to be presented to the county clerk is
>
> *51
>
> paid at the time of a property's sale, indicating that the property's title is clear of this lien. *When a lending institution fails to carry through on making the filing, it can often fall upon a current seller to again pay for the service to ensure that their present transaction can go forward.*
>
> Banks and other lender[s] have their mortgages recorded with the county clerk to ensure that others are aware of their interest in a property. *It is just as important that the document giving notice of the satisfaction of that interest is properly recorded. The legislation provides a remedy to ensure this takes place.*

N.Y. Bill Jacket, 2005 S.B. 48, Ch. 467 (emphasis added). The majority opinion posits harms such as a cloud on title, reputational harm, or impairment of credit; but these things are nowhere referenced in the bill jacket. That is unsurprising because any such problem could be unilaterally solved simply

by paying a second fee—which would be all of $50.50 for the mortgage at issue.

The majority acknowledges the statutory purpose to induce good record-keeping and to incentivize lender compliance, but argues that the statute "might" serve other purposes because the bureaucratic purpose does "not negate the existence of a protectible legal interest for mortgagors." Maj. Op. at 20 & 20-21 n.11. If any protectible legal interest for mortgagors existed, I would agree. But the legislative history reveals no "concern[] with traditionally actionable harms to mortgagors." Maj. Op. at 20. The problem recognized by the legislature is that "frequent" or "often discovered" failures to file can impair *52 public record-keeping; and the legislature dealt with it by incentivizing compliance. Maj. Op. at 21 (quoting N.Y. Sponsors Mem., 2005 S.B. S48B and N.Y. Bill Jacket, 2005 S.B. 48, Ch. 467).

In any event, the Maddoxes need not show a cloud, or any other injury, or risk of one. The Maddoxes can collect their $1500 statutory penalty without fuss, and probably without counsel. So this federal litigation is purely a play for class action status (and lawyer's fees), which—significantly—is unavailable for this procedural violation under New York law. The New York Rules of Civil Procedure preclude class actions unless the "statute creating or imposing a penalty . . . specifically authorizes the recovery thereof in a class action." C.P.L.R. § 901(b). The statutes do not so authorize.

The unavailability of a class-wide recovery under New York law confirms that the statutes do not compensate for individual harm, and that their purpose is not to protect individuals' concrete interests. The penalty is payable without a showing of individual harm; and it would obviously be inadequate and uncalibrated to any harm that would be actual. The only conclusion is that the private right of action is in aid of a public interest. The majority's ruling is therefore error.

53    *53

It is also mischief. Allowing this claim to proceed as a class action in federal court disrupts a balance created by the New York legislature. New York has an interest in regulating banks without choking them, and it is a policy choice to create a private right of action to enforce a regulation while foreclosing class action liability. Of course, the New York Rules of Civil Procedure do not preclude a federal court sitting in diversity from entertaining a class action. See Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co., 559 U.S. 393, 410 (2010). But constitutional standing in this case is premised on deference to the judgment of the New York legislature, which created a legal interest enforced by defined penalties without provision for enforcement by class action. The majority opinion thus upsets the balance created when the legislature disallowed a class recovery. Instead of a handful of $1500 claims to discipline lazy bookkeeping, the banks potentially face a high multiple of that amount, while each claimant gets less than the statutory award after attorneys' fees are levied. None of this serves any interest created by New York. *54

54

## II

The majority assumes that the New York legislature enacted the statutes to protect mortgagors from adverse effect on credit, negative financial reputation and, in some cases (but not this one), clouded title. There is no authority for that assumption.[23]

23  Four judges have posited that failure to timely record the satisfaction may adversely affect an individual's credit; but three of them relied on Judge Briccetti's observation in Jaffe v. Bank of Am., N.A., 197 F. Supp. 3d 523, 528 (S.D.N.Y. 2016), which was made without citation. See Nicklaw v. CitiMortgage, Inc., 855 F.3d 1265, 1273 (11th Cir. 2017) (Martin, J., dissenting from denial of rehearing en banc); Bowman v. Wells Fargo Bank, N.A., No. 14-CV-648 (CS) (LMS), Dkt. No. 125 at 9 & Villanueva v. Wells Fargo Bank,

N.A., No. 13-CV-5429 (CS) (LMS), Dkt. No. 115 at 9 (S.D.N.Y. Jan. 25, 2017) (Seibel, J.); Bellino v. JPMorgan Chase Bank, N.A., 209 F. Supp. 3d 601, 607 (S.D.N.Y. 2016) (Román, J.).

True, according to the Erie County Clerk's office, a mortgage satisfaction is searchable by an individual's name. See Erie County Clerk, *Search Help*, http://ecclerk.erie.gov/recordsng_web/search_help.html (last visited May 5, 2021). But a mortgage account is included in a credit history only if it is reported by a lender. See Jennifer White, *How to Report Payment History to Credit Bureaus* (Feb. 21, 2021), https://www.experian.com/blogs/ask-experian/can-i-add-good-payment-history-credit-report/ (last visited May 5, 2021). The majority asserts that it is a reasonable inference "that, during the period of delayed recordation, *55 the Maddoxes' credit was adversely affected." Maj. Op. at 30 n.14. But there is no reason to think (certainly nothing in the record) that BNY Mellon failed to report to the credit report agencies that the Maddoxes' mortgage was fully paid off. The bank prepared and delivered the satisfaction of mortgage, notwithstanding the delay in filing. So there is no support for an assumption that the failure to record impaired the Maddoxes' "financial reputation." Id. at 29. If such harms had befallen the Maddoxes, then Tometta Maddox Holley—who claims to have "expend[ed] substantial time" investigating the delay in recordation—would have alleged as much. App'x at 88 ¶ 8.

If, contrary to fact, there were any risk to a mortgager from delayed filing of a discharge, the Maddoxes were never exposed to it. They paid off the mortgage loan when they sold their property to two nonparty individuals. The satisfaction of mortgage was executed without delay, on November 7, 2014. True, BNY Mellon failed to record that document until September 22, 2015; and in the interval, it may be said that the two nonparty homebuyers ran a risk if they had flipped

the property that the title insurer would flag a vestigial lien. But the Maddoxes, who had already sold the property, did not suffer a detriment and 56 *56 never ran the risk of one. Their prize of $1500 was their incentive for enforcing a law that otherwise had no impact on them.

An injury cannot be concrete if no risk of harm ever materialized. The only reason a *risk* of harm can suffice for Article III standing is if at some point in time the plaintiff has had a sword above her head—which by itself can be a real injury. The majority relies on Cohen v. Rosicki, Rosicki & Assocs., P.C., 897 F.3d 75, 78-79 (2d Cir. 2018), in which a foreclosure complaint against Cohen named the wrong creditor. By the time the error was fixed six months later, the "misrepresentation might have deprived Cohen of information relevant to the debt prompting the foreclosure proceeding, posing a 'risk of real harm' insofar as it could hinder the exercise of his right to defend or otherwise litigate that action." Id. at 81-82 (citing Strubel, 842 F.3d at 190). That risk, which actually fell upon that plaintiff, was concrete notwithstanding that the potential harm from the mistake had been eliminated prior to the federal lawsuit. Id. In short, though the harm itself did not materialize, the risk of it certainly did.

Here, not even a risk materialized. The supposed risk to the Maddoxes' credit rating is fanciful, as the unfiled mortgage release is no indication that the paid-off loan was mistakenly deemed to be 57 outstanding. *57

The other case on which the majority leans, Strubel v. Comenity Bank, 842 F.3d 181 (2d Cir. 2016), likewise defeats the majority's holding. In Strubel, the plaintiff lacked standing under the Truth in Lending Act to raise certain of his challenges to the sufficiency of a bank's disclosures. First, as to non-disclosure of "a consumer's obligation to provide a creditor with timely notice to stop automatic payment of a disputed charge," the plaintiff never experienced a risk of harm because the bank offered no

automatic payment plan. Id. at 191-92. Second, as to prompt acknowledgment of corrected billing errors, the alleged violation raised no risk of harm to any consumer, including the plaintiff. Id. at 193. With respect to both claims in Strubel, the plaintiff never ran an actual risk of harm, and therefore lacked standing. The majority cannot deploy that result to argue that a risk to someone—but not the plaintiffs—suffices under Article III. To hold that one person's risk is sufficient for another person's constitutional standing is easily understood as nonsense.

A real risk of harm may amount to a concrete injury even if it did not result in the harm it risked; but there is no concrete injury if no risk of injury 58 ever arose in the first place. *58

## III

The Maddoxes never suffered a cloud on title prohibiting them from selling their property, or adverse effects on their credit, or an inability to finance another property, or even a risk of these harms. Even if they had paid off their mortgage without selling the house, the risk of harm would have been insubstantial. The trivial nature of a recordation delay is reflected in the 30-day delay that is tolerated without penalty, and by the small penalty exacted even after 90 days.

The plaintiffs seem to appreciate—as the majority opinion does not—that lack of harm or risk thereof is fatal to standing. (Only a lawyer could complain about a state of affairs in which no one is harmed or at risk.) That is why, backing and filling, Tometta Maddox Holley attested (in her affidavit opposing BNY Mellon's motion for judgment on the pleadings) that the bank's failure to timely record the satisfaction after she sold the property caused her "great stress, mental anguish, anxiety, and distress, which compelled [her] to expend substantial time attempting to determine the status of the recording of the satisfaction of mortgage document, and seeking out legal counsel to assist [her] in having the satisfaction of mortgage 59 recorded." App'x at 88 ¶ 8. *59

The majority found standing without reaching this argument. But because I would otherwise conclude that the Maddoxes lack standing, I do need to consider whether obsessive anxiety, together with the procedural violation, is sufficient for constitutional standing. I conclude that in this case, it is not. Thoroughness requires that I plug this hole.

Emotional distress and pecuniary loss can be concrete harms for purposes of the injury-in-fact requirement. See Denney v. Deutsche Bank AG, 443 F.3d 253, 265 (2d Cir. 2006). However, the Maddoxes must "plead enough facts to make it plausible that they did indeed suffer the sort of injury that would entitle them to relief." Harry v. Total Gas & Power N. Am., Inc., 889 F.3d 104, 110 (2d Cir. 2018). Although "[i]t is well established in principle that the pleading standard for constitutional standing is lower than the standard for a substantive cause of action," id., Tometta Maddox Holley's affidavit is altogether implausible.

She demands opportunity costs because she "expend[ed] substantial time attempting to determine the status of the recording of the satisfaction of mortgage document." App'x at 88 ¶ 8. But if she did, she would have found out that the satisfaction was recorded three months *before* 60 the filing of the complaint, *60 which nevertheless alleges that the satisfaction was unrecorded at the time this litigation began. As to her emotional distress, she offers no reason why the delayed recordation caused her "great stress, mental anguish, anxiety, and distress." Id. Only some impairment of reason could excite trauma in this circumstance. A perfunctory allegation of emotional distress, disconnected from any real risk of harm, is insufficient to plausibly allege constitutional standing.

## IV

The majority asserts that the statutes create "substantive" rights because they protect against harms closely related to those traditionally

recognized at common law, and that therefore a violation of the statutes suffices to establish standing.[24] One such traditionally-recognized harm floated by the majority is clouded title. However, the facts of this case defeat the assumption that delayed recording "typically" clouds title. Maj. Op. at 24. Having sold their property by the time they paid off the mortgage—and thus before any delay in recordation—the Maddoxes had no title on which a cloud could settle. The hypothetical cloud that might arise in some (other) cases cannot manifest the required 61  "close  *61  relationship" between the harms addressed by the recording statutes and any "ancient" remedy. Id. (first quoting Spokeo, 136 S. Ct. at 1549; and then quoting Bellino v. JPMorgan Chase Bank, N.A., 209 F. Supp. 3d 601, 609 (S.D.N.Y. 2016)).

> 24  The Spokeo majority does not use the label "substantive," nor does Cohen or Strubel. But it will do.

The majority further posits that "the right to timely recordation of discharge has close ties to traditional reputation-based harms actionable at common law," likening "the false appearance that the borrower has not paid his debt" to libel and slander. Maj. Op. at 24-25. There is no support for the idea that the statutes were intended to supplement (by $1500) the existing protections for reputation. Even Ms. Maddox, who avers she was at wit's end over the delayed filing, did not fret over this danger, which is even less plausible than her other anxieties.

The Maddoxes have an easy way to collect their reward for reporting the bank's delay in recording the mortgage satisfaction: they may recover the statutory penalty in state court.[25] This is a small claim, in a fixed amount, amenable to a recovery without dispute—and without counsel or fees. It is hard to imagine that a bank would press the issue 62  to litigation.  *62

> 25  "[S]tate courts are not bound to adhere to federal standing requirements . . . ." ASARCO Inc. v. Kadish, 490 U.S. 605, 617 (1989). --------

Allowing this matter to proceed as a class action in federal court is a spinning of wheels that advances no interest but that of counsel. The ruling does not serve New York law: it disregards the intention manifested by the New York legislature in creating the legal interest. And it confuses the federal law of standing by holding that the Maddoxes have a concrete injury notwithstanding that they never suffered a harm or the risk of it.

This case nicely illustrates a widespread judicial fallacy: the more litigation there is, the closer we come to justice. It should be enough for the law that people suffer no harm or peril. But then, without a plaintiff, there is no fee.

casetext