1              UNITED STATES DISTRICT COURT

2             NORTHERN DISTRICT OF CALIFORNIA

3   Before The Honorable Laurel Beeler, Magistrate Judge

4

5   CALLAHAN, et al.,            )
                                 )
6           Plaintiffs,          )
                                 )
7   vs.                          )   No. C 20-08437-LB
                                 )
8   ANCESTRY.COM, Inc., et al.,  )
                                 )
9           Defendants.          )
    _____)
10
                                 San Francisco, California
11                               Thursday, February 25, 2021

12

    TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC SOUND
13            RECORDING 9:43 - 10:10 = 27 MINUTES

14

    APPEARANCES:
15
    For Plaintiffs:
16                               Law Office of Benjamin R.
                                   Osborn
17                               102 Bergen Street
                                 Apartment 4
18                               Brooklyn, New York 11201
                            BY:  BENJAMIN R. OSBORN, ESQ.
19
                                 Morgan & Morgan
20                               Complex Litigation Group
                                 711 Van Ness Avenue
21                               Suite 500
                                 San Francisco, California
22                                 94102
                            BY:  MICHAEL RAM, ESQ.
23

24

25           (APPEARANCES CONTINUED ON NEXT PAGE)

2

1  APPEARANCES:  (Cont'd.)

2  For Defendants:
                              Quinn Emanuel Urquhart
3                               & Sullivan, LLP
                              865 South Figueroa Street
4                             10th Floor
                              Los Angeles, California 90017
5                        BY:  SHON MORGAN, ESQ.

6  Transcribed by:            Echo Reporting, Inc.
                              Contracted Court Reporter/
7                             Transcriber
                              echoreporting@yahoo.com
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1  <u>Thursday, February 25, 2021</u>                          <u>9:43 a.m.</u>

2                      P-R-O-C-E-E-D-I-N-G-S

3                           --oOo--

4            THE CLERK:  Calling Civil Action 20-8437, Callahan

5  -- Callahan, et al. versus Ancestry.com, et al.

6       Counsel, can you please state your appearances for the

7  record?

8            MR. OSBORN:  Benjamin Osborn for the Plaintiffs.

9            THE COURT:  Good morning.

10           MR. RAM:  Good morning, your Honor.  Michael Ram

11 also for Plaintiffs.

12           MR. MORGAN:  And good morning, your Honor.  Shon

13 Morgan for Ancestry.

14           THE COURT:  All right.  Just give me a minute.

15 I'm actually usually in the office on my calendar days, but

16 I'm not today.  So I'm a little less stable with my work

17 platform than usual.

18      So thank you very much for your helpful papers.  I'm

19 going to just give you my thoughts about where I am, and

20 that way you can tell me, you know, anything else that --

21 you know, you can take that as a -- as a launching point for

22 whatever argument you might make.

23      So, you know, when I look at the papers -- and there

24 were a lot of different arguments that Ancestry.com

25 advanced, right.  So there -- there are a ton -- well, not a

4

1 ton but more than several, and I think the main one for me
2 was standing and, you know, sort of boiled down considering
3 standing in the context of Ancestry.com's essentially
4 monetizing the Plaintiffs' public yearbook information, and
5 I know that the Plaintiffs, you know, say, Oh, come on, you
6 know, decades old yearbooks are different than Facebook
7 profiles, for example.  I'm just making that as an -- you
8 know, an observation.  The analysis is different.
9      But when I look at, say, Fraley or Cohen as the
10 counterpoint, it seems to me for standing for injury, you
11 know, you have to have something more than monetization.
12 Right.  So in Fraley, the something more was the implication
13 that the Plaintiffs were lending their recommendation to --
14 to the ad.  In Cohen, by contrast -- and I think Cohen was a
15 Judge Seeborg case -- he distinguished, you know, cases
16 where people, while not celebrities, were models and -- and
17 sort of -- their sort of right of publicity was different.
18      And so when I -- when I consider the standing cases, it
19 just seems to me that the injury -- and it's not -- you
20 know, the statutory scheme requires injury and -- as opposed
21 to those statutes, as Ancestry pointed out in its motion
22 where a violation of the statute is enough and when you
23 consider standing in the context of sort of the classic, you
24 know, consumer protection statutes, I think in the federal
25 statutes, the Class of 1970s Consumer Protection Statutes.

5

1 This isn't that.  So that's -- from a standing perspective,
2 I have a hard time seeing standing.  That's point one.  And
3 that's dispositive.  There are a lot of -- but just -- I'll
4 just tick through a couple of things that I -- you know, my
5 inclination is to -- that the motion to dismiss is a fair
6 one based on that ground, with leave to amend, of course,
7 because of the injury required, but that's -- that's the
8 main part, and I know that Plaintiffs will want to address
9 it, but I'll just tick through, you know, just -- just --
10 because I think there's a utility to it for whatever comes
11 next.
12        On the -- you know, as you know, I've written
13 extensively on -- well, I think you know -- the
14 Communications Decency Act.  I've thought about it far more
15 than -- it's almost embarrassing how much I thought about it
16 because I really did think about it a lot, and I think that
17 -- I -- I didn't hear, I think, the best argument.  I -- I
18 just -- I think it probably does apply.  I didn't write it
19 that way, but I think it probably does apply, and almost
20 certainly does apply.  And I was just prepared to kick the
21 can down the road a little bit, and the only reason for
22 doing it -- and I don't think it's the same -- I think it
23 was _Fraley_ -- the solicitations transformed the profiles
24 into something more, more like an advertisement.  I don't
25 think the emails here do that, so that the only analog --

6

1  and so I don't think it rises to that level.  And I just --

2  because I think standing's dispositive and not because I ran

3  out of time -- I mean, I did spend a lot of time thinking

4  about it, but I just decided not to write it because it's a

5  little bit of a nuanced discussion, and I didn't -- I just

6  -- I didn't do it.  So that's on the CDA.

7      I think, you know, as to this -- this goes to the

8  number -- the second argument, the statutory public affairs

9  exception and also to Ancestry's anti-SLAPP motion, I --

10  and, again, I should be looking at my notes as opposed to

11  reporting from memory, which is always a bit dangerous.

12  But, you know, when I look at those cases, I don't see it --

13  I don't see that that argument's necessarily a good one.

14  And, again, I didn't write -- I didn't -- not saying it's

15  not a good argument.  Not -- I don't know that it's a

16  dispositive argument.  That's a better way of putting it.  I

17  didn't write it.  I sort of kicked the can down the road a

18  little bit.  I didn't -- well, actually, I did address it

19  because I did address it in the context of the anti-SLAPP

20  motion, but I didn't address in terms of the statutory

21  challenge that -- that anti-trust is contending, that is, I

22  mean, from my ability.

23      I think that cases you cited generally involve

24  celebrities, public officials, public realm, areas more

25  obviously in the public interest, and I just have a tough

7

1  time seeing how decades old yearbooks are demonstrably an

2  area of public interest that kind of gets you out of the

3  statutory landscape.

4      And so I think that's -- you know, that's -- I didn't

5  -- you know, I -- I did not -- I -- as to the copyright

6  preemption, you know, I just -- it -- it wasn't case

7  dispositive.  So I -- I need to think about that more.  The

8  intrusion upon seclusion claim, you know, I -- it -- I have

9  a tough time seeing how that survives, but I didn't -- I

10 didn't write it.

11     So my order, the draft order, because I almost always

12 draft an order before argument, is -- is about standing and

13 anti-SLAPP.  So I thought it might be useful just to get a

14 preview of some of the things I'm thinking about for claims

15 -- for arguments, and I'm not necessarily reading the big

16 one, but, you know, so I think the big one is standing, and

17 so I invite the Plaintiffs -- I know it's the -- I know it's

18 Ancestry's motion, but since I'm more or less going -- I

19 think we should take the dispositive issue first.  I think

20 that we should let the Plaintiff speak to it and then, Mr.

21 Morgan, you can respond, and then if you want to say

22 anything about my tentative on the anti-SLAPP motion, you're

23 welcome to do so.

24     Okay.  So that's -- that's what I've got at a starting

25 point.

8

1        MR. OSBORN:   Okay.   Thanks very much.   So I'm Ben

2   Osborn, representing the Plaintiffs, and I can -- I can

3   respond to your thoughts on standing.   I'll focus on

4   standing and then would be happy to speak as well to the

5   communications decency argument.

6        THE COURT:   Yeah, those are the two that are sort

7   of case dispositive because if you -- if you manage to get

8   through the Communications Decency Act and standing, I think

9   -- I think you're probably okay on the public -- you know,

10  the public exception.   Okay.   So standing.

11       MR. OSBORN:   Great.   So on standing, you know, we

12  have multiple grounds that we've alleged for standing.   I

13  know you've said that you think it requires something more

14  than monetization in order for standing to exist in this

15  case, but we have multiple grounds.   That's one of the

16  grounds, the fact that Ancestry monetized the Plaintiffs'

17  likenesses is one of our grounds.   We do allege that the

18  fact they profited gives standing in this case.

19       We also allege that the -- the fact of a violation of a

20  statute intended to protect privacy is in and of itself

21  grounds for standing.   And so I'll start there, the

22  violation of the statute itself.   And the main case is

23  Davis.   And Davis says very clearly its reasoning about

24  slightly different statutes, its reasoning about the Stored

25  Communications Act, as well as the Federal Wiretap Act, and

9

1 CIFA (phonetic), the California law.  But it says when a

2 statute basically creates a statutory right that has been

3 long recognized as a privacy right at law, the fact of

4 violating that statute creates standing for the Plaintiffs.

5 That's Davis, and I believe Fraley supports the same -- the

6 same kind of finding.  So Davis and Fraley would be our main

7 cases for -- for that point.

8      So that the -- Ancestry would suggest that you picked a

9 statement of -- out of Fraley and take it out of context

10 because when you actually look at what Judge Koh did, she

11 did sort of ground the opinion in sort of the -- the injury

12 being the appearance of, you know, lending, you know -- sort

13 of recommending the -- the feature to -- to friends.

14           MR. OSBORN:  So --

15           THE COURT:  How do you respond to that argument?

16 That was an argument I believe that they made in their reply

17 brief.

18           MR. OSBORN:  They did make that argument in their

19 reply brief.  If you go and look at the sentence that

20 they're citing, Defendants actually cut off that sentence

21 before the end of the sentence.  I can read it to you.  So

22 our position is that Fraley finds standing on alternate

23 grounds.  Both the -- the gain by the -- by the Defendants

24 in that case and the fact of the statutory violation.  And

25 the -- the sentence says:

10

1          "Plaintiffs assert that they have a

2          tangible property interest in their

3          personal endorsement of Facebook

4          advertisers' products to their Facebook

5          friends."

6      Right, that's the first half.  That's finding standing

7  based on the assertion of the tangible property interest,

8  which we're also asserting in this case.

9          -- "and that Facebook has been

10          unlawfully profiting from the non-

11          consensual exploitation of Plaintiffs'

12          statutory right of publicity."

13      That's at 799 in <u>Fraley</u>.  And Defendants gave you a

14  selective quotation.  They didn't give you the second half

15  of that sentence.

16          THE COURT:  Okay.  So what about the argument --

17  so as to your -- so, you know, as to your three sort of

18  grounds for standing -- and I know that you -- you started

19  with the third, you know, the fact that when -- which I

20  think of -- you know, I think of, you know, the first one

21  paying -- you know, exploiting likenesses and profits, I

22  think of that as the <u>Fraley</u> issue, I guess number three,

23  that the statutory -- you know, the denial of the 3344 right

24  is --

25          MR. OSBORN:  Yes.

1      THE COURT:  -- similar argument.  But then I think

2 the second one was they've lost potential earnings from the

3 commercial use of their license -- their likenesses, which I

4 think of as the Cohen argument.

5      And what do you think of Judge Seeborg's distinct --

6 you know, distinguishing cases involving models -- you know,

7 obviously, celebrities is one thing.  Models being people

8 who, you know, have sort of a -- for lack of a better word,

9 maybe a stake in monetizing their commercial likenesses

10 themselves and Judge Seeborg expressly distinguished those

11 cases from the -- from the Facebook users in Cohen.  And so

12 -- so how does -- on that second theory that you advanced,

13 how do you get over that -- that characterization of the

14 case law?  I guess you would just go back to Davis and say,

15 you know, it's -- it's that they commercially profited from

16 the statutorily protected privacy right is enough, if that's

17 your argument.

18         MR. OSBORN:  Well, no.  We're arguing in the

19 alternative.  So the --

20         THE COURT:  Right.

21         MR. OSBORN:  The statutory right is one.  And, by

22 the way, we think of that statutory right as being like a

23 property right, sort of like a -- it's an intellectual

24 property right.  It's like a patent, right.  You don't need

25 to prove in a patent case that you were going to go exploit

1  the invention and get profit from it.  It's enough that

2  someone else took it, something that belonged to you,

3  without your permission.

4          THE COURT:  But it is sort of a -- so I -- it's --

5  it's a right of publicity right, though.  And so it's a

6  little bit different because that right of publicity tends

7  to be grounded in who you are.  And, of course, this is

8  public information.  I know it's -- it's old public

9  information.

10          MR. OSBORN:  Yeah.

11          THE COURT:  Yeah.  You know, it's --

12          MR. OSBORN:  On the -- on -- sorry.  Go ahead.

13          THE COURT:  Oh, that's okay.  No.  I'm interested

14  in what you have to say.

15          MR. OSBORN:  Yes.  So on the -- there's -- so you

16  sort of said two things.  One is it's public information,

17  and the other is, well, these people aren't celebrities, nor

18  are they models, right.  So do they have the same right to

19  publicity that applies in these other cases.

20     So I'll -- I'll -- I'll start with that last point, do

21  they have the same -- do they have the same right.  There's

22  no requirement under Section 3344 that you be a celebrity.

23  In fact, California case law has long recognized the right

24  to publicity for non-celebrity plaintiffs.  Cases like KNB

25  Enterprises, although you're right, KNB Enterprises was a

13

1 case about people who were models.  They were selling their

2 likenesses --

3            THE COURT:  And that's what Judge Seeborg relied

4 on applying the same statute and -- and relied o that case.

5            MR. OSBORN:  That's true.  But the language of the

6 case says very broadly there's no limitation.  In fact, it

7 says that although Section 3344 started out as limited to

8 celebrities, right, it was then expanded by the legislature

9 to involve non-celebrities as well, and the language in KNB

10 Enterprises says even as a non-celebrity -- and it doesn't

11 limit itself to the fact that the -- that the Plaintiffs in

12 KNB Enterprises were models.  It says any non-celebrity --

13 KNB Enterprises I'm talking about says any non-celebrity has

14 the right to this.

15      Now, with respect to Cohen, Cohen is distinguishable.

16 I can tel you how it's distinguishable, but I think the more

17 important point is Fraley is inconsistent with Cohen.  In

18 Fraley, the Plaintiffs were individuals.  They were not

19 models, right, and the Section -- the Court found standing

20 existed under Section 3344 on alternate grounds, right, both

21 the violation of the statutory right and the fact that

22 Facebook had profited from its use of their likenesses.  And

23 the Court found that -- obviously, the Plaintiffs in that

24 case were not models.  So it would be hard to reconcile.

25      Now, the way Fraley reconciles Cohen is it says in

14

1  <u>Cohen</u>, the Plaintiffs in that case actually didn't allege

2  any economic damage.  They didn't even allege that the

3  Plaintiffs in that case were harmed by the taking of their

4  likenesses properly.  Now, granted, that's kind of a ticky-

5  tacky way to distinguish it, but it is what the <u>Fraley</u> court

6  did.

7          THE COURT:  I saw that.  I saw that.

8          MR. OSBORN:  Great.  And I'm sorry, I've now --

9  you had a second -- oh, your second point was picking up on

10  the Defendants' point that, you know, these likenesses have

11  been out in the world in a sense because -- and we agree the

12  Plaintiffs agreed to have their photos taken for yearbooks

13  as minors 20 years ago in a context where they expected

14  those yearbooks to be distributed, you know, amongst their

15  friends and family.  That, of course, does not affect their

16  right to assert the right to publicity.  Right.  If you read

17  Defendants' briefing, it would almost stand for the

18  proposition that if you publish a likeness in a book, that

19  gives anyone else the right to copy it and use it to promote

20  their website.  That's kind of backwards to what the right

21  to publicity is meant to do.

22      The right to publicity is meant to make it safe for you

23  to put your name and likeness in the world in the knowledge

24  that no one's going to take it and commercially exploit it

25  without your permission, right.  And there's plenty of cases

1 standing for this.  There's <u>Downing</u>.  There's <u>Solano</u>.  Those

2 all concern people who had a published likeness out in the

3 world.  In <u>Solano</u>, it was a magazine.  In <u>Downing</u>, it was in

4 a book.  Someone copied that likeness and then exploited it

5 commercially.  Of course, that's -- that can't -- it cannot

6 be that the right -- that you sacrifice the right to

7 publicity the second you put your likeness in the world,

8 just as it cannot be that you sacrifice a patent the second

9 you use that patented invention.

10            THE COURT:  Okay.  All right.  Why don't we hear

11 from Mr. Morgan, and then if we want to touch briefly on the

12 CDA, we can, although I don't -- I don't know that we need

13 to, but -- but the -- the one issue is I've got a calendar

14 to get through, and then I've got a 10:30 calendar that's

15 criminal.  So I do need to sort of move things along a

16 little bit.

17     So, Mr. Morgan.

18            MR. MORGAN:  Sure, your Honor.  I'll go quickly on

19 the standing points.  First, <u>Davis</u> and the statutes at issue

20 there did not involve a separate actual injury requirement.

21 There are many federal statutes, the FCRA, that don't have

22 actual injury requirements, and those are the kind that were

23 at issue in that case.  So they're really not applicable

24 here where it's been acknowledged by court after court that

25 there is an actual injury requirement in 3344 and it's right

16

1  in the text.

2      On Fraley, I think, you know, counsel for Plaintiffs

3  was running together the two phrases where Fraley talked

4  about the allegations of actual injury and then the

5  Defendants' profits.  And I think what the Court was saying

6  was the Defendants' profits can become measure of damages if

7  the Plaintiff has established standing through actual

8  injury, but the Plaintiff still has to establish actual

9  injury first.  The Defendants' profits isn't a substitute

10 for the actual injury requirement.

11      So, in other words, you establish an actual injury.

12 Then what becomes relevant for damages?  The Defendants'

13 profits, but not until you cross the threshold of

14 establishing actual injury, and I think your Honor hit it on

15 the head with the failure here of the Plaintiffs to allege

16 that.  I mean, what was important in Fraley, even though

17 those were private citizens, was that you had Mark

18 Zuckerberg admitting that the opinion of --

19          THE COURT:  Of the Holy --

20          MR. MORGAN:  -- a private citizen --

21          THE COURT:  -- the Holy Grail, right.

22          MR. MORGAN:  Right.  Sure.

23          THE COURT:  No, I -- I get it.  Right.  And it

24 does make --

25          MR. MORGAN:  So --

1       THE COURT:  And it makes sense, right, if you -- a

2  friend recommends something that's -- that's good, and --

3  and so that certainly was done without the Facebook user's

4  permission.

5       MR. MORGAN:  And we are certainly not contending

6  that the statute does not apply in any instance to private

7  citizens.  That example is a very good one.  It just doesn't

8  apply on the allegations here.

9       THE COURT:  Okay.  Why don't we talk -- why don't

10  we just touch like just a minute so, Mr. Osborn, if you want

11  to just touch on the CDA and then just I'd be interested to

12  see what you have to say, and then we'll go to see if Mr.

13  Morgan wants to say anything about the anti-SLAPP motion.

14       MR. OSBORN:  Sure.  Absolutely.  I do have a

15  response to Mr. Morgan's --

16       THE COURT:  That's fine.  Why don't you respond to

17  that first and then hit the CDA.

18       MR. OSBORN:  Oh, fair enough.  On the point that

19  actual injury -- actual injury is required under the

20  statute, actually, the reasoning in Davis applied to

21  statutes where under Defendants' reasoning actual injury

22  would be required in a statute.  The Stored Communications

23  Act includes a requirement that a person be aggrieved,

24  right.  And the language -- when a statute says aggrieved or

25  actual injury, that doesn't necessarily mean the statute is

18

1  telling you what type of aggrievement or actual injury is at

2  issue here.  The language in the statute, including the

3  person injured, is just meant to distinguish the person

4  injured from the person doing the injury.

5      And the logic of Mr. Morgan's argument would apply

6  equally to the Stored Communications Act, which <u>Davis</u> found

7  there is -- there can be standing under the Stored

8  Communications Act, even when there's no allegation of

9  actual injury or aggrievement.

10     Moving on to the Communications Decency Act, if I could

11 leave this Court with one case -- two cases I guess -- it

12 would be <u>Batzel</u>.  That's -- I actually don't know if I'm

13 pronouncing that correctly, but it's <u>Batzel v. Smith and</u>

14 <u>Roommates</u>.  These cases support our argument that there's no

15 CDA protection here because the authors of the content, the

16 creators of the yearbook, never intended that content to be

17 posted on the Internet.  All right.  That's our first

18 argument in our briefing.  And that's a very clear standard

19 from <u>Batzel</u>, and it's picked up in <u>Roommates</u> as well.  I

20 mean, they created the content at a time the Internet didn't

21 exist.  They couldn't possibly have intended it to be

22 posted, and the standard is when a company goes out and

23 copies hard copy material -- this is literally what <u>Batzel</u>

24 says -- that wasn't intended for posting on the Internet,

25 there's no CDA protection.

1        THE COURT:  Let me -- I recognize that you said in

2   your complaint that Ancestry doesn't disclose how it

3   generates its content, but you also talked about how people

4   are, you know, sort of encouraged to post their yearbooks

5   and, you know, subject to the copyright disclaimer issues

6   that Ancestry requires.

7        So, you know, if that's the case why these users didn't

8   post their content but somebody else did, not -- presumably

9   not Ancestry, and that puts it back into CDA land.  I don't

10  think -- so and then -- and then this is data, right.  This

11  is -- the reason I'm having a tough time with this case is

12  this is a dat case, right.  It's data that happens to

13  include images, but it's just data.  It's not really

14  generation of any content.  It's just selling access to

15  somebody's data which is sort of typical.  This is just a

16  different model of doing it because it's doing it through

17  the yearbook database.

18        MR. OSBORN:  Right.  So I'll address both of this.

19  Let's start with the -- the point around who's choosing to

20  post this content, right.  We don't know how Ancestry gets

21  yearbooks.  We -- we really don't.  They may copy them from

22  -- they mentioned they know yearbooks are present at

23  libraries.  They may copy them from there.  They may get

24  them through donations.  But even if it's built through

25  donations, there's no evidence that the people who created

20

1   the yearbooks are the ones making the donation, right.  The

2   -- the standard is if the person who created the content

3   wanted it to be on the Internet, then you --

4              THE COURT:  Okay.

5              MR. OSBORN:  -- (indiscernible).  Probably someone

6   who had it like behind me, right, on their shelf, who

7   decided to send it in to Ancestry.  By the way, because

8   Ancestry solicited it, not because they of their own

9   volition decided to send it.

10       And the point around this being a data base, I --

11  obviously Plaintiffs don't think so, but the -- the

12  reasoning is because actually what Ancestry is doing in this

13  case is very similar to what <u>Fraley</u> -- Facebook was doing in

14  <u>Fraley</u>.  Right.  You referred earlier to the Holy Grail of

15  advertising, which is having a friend tell you they like

16  something, right.  Here, the Holy Grail of getting someone

17  to subscribe to Ancestry.com is to show them the name or

18  likeness of someone you went to high school with or who's a

19  friend of yours, right.  And we have statements from

20  Ancestry's own communications reference investors saying our

21  ability to retain and attract new subscribers depends on our

22  ability to send messages, not just on site messages.  There

23  are also emails sent to people that say, hey, this person is

24  on Ancestry.com.  Click to see their profile and pay money

25  to see it.

21

1          THE COURT:  So what if -- what if -- just one

2  hypothetical.  What if, you know, public libraries digitized

3  yearbooks that are in their possession and put them up on

4  their Internet, didn't charge -- maybe they charge people

5  because they're trying to fund raise for the library, may

6  not.  That might be a measure of damages as opposed to

7  injury.  So we'll just put, you know, who cares?  Would you

8  be suing the public libraries?

9          MR. OSBORN:  Well, if the public library included

10  an advertising message that had the name of the Plaintiff,

11  the photo of the Plaintiff, and a button beneath that said

12  subscribe now, click here to pay for access --

13          THE COURT:  Support your public libraries, donate

14  now.

15          MR. OSBORN:  -- I mean, that changes, I suppose,

16  the -- the feel of the case because it's for the sake of a

17  public library --

18          THE COURT:  Yeah.

19          MR. OSBORN:  But Ancestry if a for-profit --

20  they're not serving the same record keeping --

21          THE COURT:  That's helpful.  I think -- so, all

22  right.  I think that's what I've got.  I'm not -- probably

23  going to reach the CDA issue.  So I think that's fine.

24  That's helpful.  Thank you for your thoughts.

25      Mr. Morgan, did you want to say anything about anything

22

1  else or address the anti-SLAPP motion or -- I've got to move

2  on to the next case in about a minute?

3          MR. MORGAN:  Very briefly, your Honor, on the

4  anti-SLAPP.  The cases, you know, don't apply this only to

5  public figures.  The First Amendment concerns that are at

6  issue have been extended to private individuals through <u>Gill</u>

7  <u>v. Hearst</u>, <u>Hicks v. Richard</u>, cases we've cited.

8      I think the real question for your Honor is is yearbook

9  information the sort of information that's of public

10 interest, and I think the discussion we just had confirms

11 this.  I mean, you've got public librarians who are tasked

12 with using limited resources to determine what's of

13 historical interest, educational interest, and entertainment

14 interest to their constituents.  And we have librarian after

15 librarian.  You go to any town, including these named

16 Plaintiffs' hometowns, and those librarians have catalogs of

17 these very yearbooks, and many of them have gone to the

18 additional expense using their scarce public resources to --

19 to digitize those and put those online.

20     So there's been a collective determination by the

21 people charged with determining what's in the public

22 interest to say that this -- this content generally,

23 yearbooks, is of very high public interest for educational

24 and historical purposes.  And, by the way, that's exactly

25 why they don't want Ancestry to get it.  People aren't on

23

1  there for kicks.  They're on there because they're doing

2  genealogies.  They're doing historical research, and it is a

3  public interest, and it's -- it's not a problem that they've

4  monetized this.  I mean, they've done a great public service

5  by collecting all this data in a place that it's easily

6  accessible.

7         THE COURT:  But -- but bringing a -- you know --

8  you know, it's -- anti-SLAPP motion really does -- I mean,

9  it is, you know, sort of First Amendment or public and, you

10  know, a demonstrable public interest, and I'm -- while I see

11  that there's a -- a -- leaving aside Ancestry's other part,

12  its overall business model about Ancestry, you know, the

13  yearbook piece of it is of interest, but I -- it feels like

14  a real stretch to me to say it's the kind of public interest

15  or protected speech that -- that puts you in a -- not a law-

16  free zone but a lawsuit-free zone.  So -- but I understand

17  the argument.  Okay.  Well, thanks very much everybody.

18  I'll take the matter under submission.  And thank you for

19  your argument and for being here today.

20         ALL:  Thank you, your Honor.

21      (Proceedings adjourned at 10:10 a.m.)

22

23

24

25

24

<u>CERTIFICATE OF TRANSCRIBER</u>

    I certify that the foregoing is a true and correct
transcript, to the best of my ability, of the above pages of
the official electronic sound recording provided to me by
the U.S. District Court, Northern District of California, of
the proceedings taken on the date and time previously stated
in the above matter.

    I further certify that I am neither counsel for,
related to, nor employed by any of the parties to the action
in which this hearing was taken; and, further, that I am not
financially nor otherwise interested in the outcome of the
action.

Echo Reporting, Inc., Transcriber

Tuesday, June 29, 2021