```
 1                UNITED STATES DISTRICT COURT
 2              NORTHERN DISTRICT OF CALIFORNIA
 3  Before The Honorable Laurel Beeler, Magistrate Judge
 4
 5  CALLAHAN, et al.,            )
                                 )
 6          Plaintiffs,          )
                                 )
 7  vs.                          ) No. C 20-08437-LB
                                 )
 8  ANCESTRY.COM, Inc., et al.,  )
                                 )
 9          Defendants.          )
10  _____ )
                                    San Francisco, California
11                                  Thursday, June 10, 2021
12
      TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC SOUND
13               RECORDING 10:12 - 10:31 = 19 MINUTES
14
    APPEARANCES:
15
    For Plaintiffs:
16                              Law Office of Benjamin R.
                                  Osborn
17                              102 Bergen Street
                                Apartment 4
18                              Brooklyn, New York 11201
                            BY: BENJAMIN R. OSBORN, ESQ.
19
                                Morgan & Morgan
20                              Complex Litigation Group
                                711 Van Ness Avenue
21                              Suite 500
                                San Francisco, California
22                                94102
                            BY: MARIE N. APPEL, ESQ.
23
24
25            (APPEARANCES CONTINUED ON NEXT PAGE)
```

*Echo Reporting, Inc.*

```
 1  APPEARANCES:  (Cont'd.)
 2  For Defendants:
                              Quinn Emanuel Urquhart
 3                              & Sullivan, LLP
                              865 South Figueroa Street
 4                            10th Floor
                              Los Angeles, California 90017
 5                       BY:  SHON MORGAN, ESQ.
 6  Transcribed by:           Echo Reporting, Inc.
                              Contracted Court Reporter/
 7                            Transcriber
                              echoreporting@yahoo.com
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

3

1  Thursday, June 10, 2021                              10:12 a.m.
2                      P-R-O-C-E-E-D-I-N-G-S
3                              --oOo--
4         THE CLERK:  Action 20-8437, Callahan, et al.,
5  versus Ancestry.com, Inc., et al.
6      Counsel, can you please state your appearances for the
7  record?
8         MR. OSBORN (Zoom):  Ben Osborn for the Plaintiffs.
9         MS. APPEL (Zoom):  Marie Appel for Plaintiffs.
10        MR. MORGAN (Zoom):  Good morning, your Honor.  Son
11 Morgan for Ancestry.
12        THE COURT:  All right.  Just give me a second.
13 I'm just getting myself sort of oriented.
14     Okay.  Okay.  So, standing.  This has been a year of
15 standing.  The interesting -- well, in all sorts of
16 contexts.  All right.  So thank you for your briefs and for
17 the Plaintiffs', you know, attempts to, you know, sort of
18 add some more facts to address the sort of issues that we
19 traveled in the earlier case.  And so I just, you know,
20 looked -- just to let you know what I did that's a little
21 bit different than the last time, you know, I did look at
22 the other cases from the other districts.  So I think it's
23 worth talking about them, you know, and I think it's worth
24 talking about them from Ancestry's perspective in
25 particular.  So I think that that's something that we should

talk about here.  And the -- the issue is at least in this District and in the Ninth, it's -- you know, standing didn't come up in the other cases, right.  I know it didn't in Lucas.  Lucas did have financial -- did allege financial harm.  In the White Pages case out of the Western District of Washington, it's very similar to this case.  It really is very similar to the case, and the issue of standing didn't come up either.

And the issue of standing, of course, because I really have thought about standing a lot since Spokeo, and -- and the issue about standing is at least the sort of (Zoom glitch) over time (Zoom glitch).  You know, I think when you look at the Ninth Circuits, you know, comeback decision in Spokeo afterwards -- I did a case some years ago that involved being on a terrorist list, you know, in a rent application the name coming up in a terrorist list, and I think I said I have a little trouble reaching the conclusion that that's a concrete harm sufficient to establish standing.  I think that's what I said in that case.

And -- and then, obviously, there's a continuum of harms, and it's very contextual.  But so, you know, the Plaintiff -- so, one, we need to talk about those cases from -- from Ancestry's perspective.  Two, the Plaintiffs do analogize to other privacy statutes.  And I -- again, I did a -- in one case several years ago, I was really dealing

1  with what I call the classic consumer protection statutes of
2  the 1970s where it was very clear that Congress was acting
3  to prevent certain harms.  I did this in one of these payday
4  lending type of cases, and it was an interesting thing to
5  consider some of those classic statutes.
6       And -- and so I think that there can be situations, as
7  the Plaintiffs advanced, that a violation of the statute,
8  the Wiretap Act, the Stored Communication Act, California's
9  Privacy Act, where the privacy rights that are protected by
10 those statutes are so fundamental, an intrusion on those
11 rights is enough where the legislature has really spoken and
12 said, no, this is not okay.  The statutory violation alone
13 -- and so I think of that as kind of like my terrorist watch
14 list case, and I think that those are consistent with this
15 idea that runs through criminal cases too that the -- that
16 the rights -- a person's privacy rights are pretty --
17 they're firmly protected by statute and even by the way the
18 Supremes have dealt with Fourth Amendment privacy issues.
19      So I just don't think this is the same kind of statute.
20 And so, leaving aside the new cases that the Plaintiff has
21 cited, which, you know, are very similar, although they
22 don't involve standing.  So I do think it would be helpful
23 for Ancestry to address those, my -- my opinion hasn't
24 changed since the last time, although I think you did a
25 great job advancing the arguments.

6

1    And so -- since it's the Defendants' motion, why
2 doesn't Ancestry at least -- because I have at least one
3 more case that I need to do before 10:30, why doesn't
4 Ancestry address those -- those different cases and why it
5 shouldn't change the outcome.  You know, obviously I've now
6 thought about <u>Fraley</u>.  I've thought about -- I've thought
7 about <u>What's More</u>, and I've looked at -- so then I'll stop
8 because I'm -- but I did consider, you know, the mental
9 anguish.  You know, obviously, it's not just endorsement.
10 Defamation is another example.  Spending -- in the data
11 breach cases, trying to address a credible threat of future
12 industry -- of future injury, future identity theft, that's
13 enough.  Those are all the examples of something more is
14 needed for standing, and I don't think any one of them from
15 the Plaintiffs' perspective changes -- changes my mind, but
16 I'm interested to hear what you have to say.
17      So, from Ancestry, what I really want to hear about is
18 the other cases that the Plaintiffs have brought to my
19 attention.  And you can touch on anything else, but I didn't
20 want you to think that I didn't think about all those other
21 cases too and think about how the Plaintiffs' new theories
22 -- I think it would be more important to hear from the
23 Plaintiffs on those issues, and then you can respond to it.
24 Okay.
25           MR. MORGAN:  Sure, your Honor.  I mean, I think

1 the biggest distinction is the one that your Honor pointed
2 out, which is the Court's didn't grapple with the Article 3
3 issue in those cases.  So we don't necessarily know how they
4 would have analyzed the issues that your Honor just went
5 through in those situations.
6     The -- the case from Washington, the analysis
7 throughout that opinion is -- is very terse.  It's not
8 nearly as detailed as -- as this Court went through in its
9 first opinion.  So, you know, it's difficult to glean from
10 what little the Court did say how they would have analyzed
11 the Article 3 issue had it been raised.
12     The Court clearly did find in the Washington case that
13 there was some association with the product in a way that
14 differs from the Court's analysis here, and, you know, this
15 Court clearly found that there was no commercial interest by
16 these Plaintiffs in this material.  Again, that was not
17 necessarily an issue that the Courts there addressed head
18 on.
19     And then in the Washington case, with respect to the
20 Communications Decency Act, there was, you know, just a few
21 lines with no analysis whatsoever.  And there the case --
22 the allegations were that the Defendant had created content
23 in a way that I don't think that, you know, even Plaintiffs
24 would contend is -- is plausible here.  There they had
25 created background reports from, you know, various sources,

synthesized them into an entirely new product that we don't have here.

I mean, going back to your Honor's opening comments about the standing issue, your Honor, I think the Court analyzed that exactly the right way, which is there's a big distinction between the privacy cases and the statutes derived from privacy interests where courts have been willing to say that there is an injury without further showing.

And with the non-privacy cases, which this is clearly not -- as your Honor ruled the first time, these were public images. They've been in the public domain for decades. You know, these are not shots of somebody in a hospital room or coming out of the shower. These are posed studio photographs that just really don't implicate privacy interests at all.

So the question then becomes have they shown the economic interest. And I think Plaintiffs' own case that they cited in trying to make a mental anguish argument really highlights the distinction here in the Miller case which involved the -- the memorability authenticator. Again, that case for -- just so we're all on the same page -- didn't involve standing or Article 3. It was about mental anguish sufficient to show statutory damages. But in assessing mental -- the mental anguish allegations there,

the Court found it significant that the Plaintiffs had identified an independent cognizable injury, either commercial loss or defamation, that supported the allegations of mental anguish.

THE COURT: That's -- that's what I -- that's what I'm calling something more, right. So --

MR. MORGAN: Right.

THE COURT: Yeah, that's what I'm just calling something more. Whether it's endorsement or like in <u>Fraley</u> -- that's the ice cube case I just had -- or whether it's commercial loss or defamation or in the context of the data breach cases, which is, you know, the -- you know, dealing with a credible risk of an injury that is in the future, that's -- all those are the something more, and what you're saying is the something more, there's no something more here, and there was in all of those cases.

MR. MORGAN: Clear. And even take on their own terms, the mental anguish allegations here are simply labels. They were embarrassed. They were uncomfortable. There's no way to plausibly tie those claims of mental anguish without the facts that are undisputed here, which, again, benign yearbook photos and the fact that one Plaintiff was a valedictorian of her class, these are not facts that give rise in any common sense way to embarrassment, uncomfortableness. So the something more is

1  completely lacking here, your Honor.
2           THE COURT:  So, all right.  Thanks.
3      Let's hear from the Plaintiffs.  So the interesting
4  thing is -- and when you think about these kinds of cases --
5  and it's sort of what runs through the Communications
6  Decency Act, which one could say is maybe a bad choice by
7  Congress about what levels of protection it affords in
8  different circumstances, you know, I think the Amazon, like
9  the Bolger case, we heard in the Amazon case, you know, a
10 determination that you're going to assess strict liability.
11 You know, there could be a different determination.  This
12 comes up in so many cases, you know.  Is -- was this a good
13 choice, right?  Was this a good choice?
14     So one of the interesting things -- and this is to the
15 Plaintiffs, you know, what do you do in this -- in this era
16 of commercialization of our data that's kind of public,
17 right?  So it really implicates -- I think so what I have --
18 you know, I am not unsympathetic, right, because you think
19 do I really want my sixth grade picture of when I had the
20 big old Coke bottle glasses before I became interested
21 enough to get contacts?  These are my computer glasses by
22 the way.  So, you know, do I really want that on
23 Ancestry.com?  I didn't even want to look to see if my old
24 yearbook pictures are on Ancestry.  I'm just kind of joking.
25 So I'm not unsympathetic on the merits, but -- but, you

1 know, it just really does implicate is that it's -- it's --
2 in contexts like these, when our data -- when -- when
3 available to others, you know, we put ourselves out there in
4 the world even though you would say, well, come on, you're a
5 kid and you're not really putting yourself out there in the
6 world and this isn't -- the fact that you might get them
7 from a -- a public library or from people donating their
8 yearbooks is not the same thing as like being out there in
9 the public realm.  It does sort of implicate, you know,
10 where do you assess responsibility, you know, liability on
11 the person commercializing our personal -- our data, and --
12 and in the standing context, you know, that's what I've come
13 up with with this something more kind of way of looking at
14 it, either endorsement or commercialization or defamation or
15 being put out by having to do stuff to -- for harm
16 reduction, you know, harm reduction.
17      And so, those -- those are ways of getting around it.
18 And then, of course, when you -- you advance those
19 fundamental statutes that we're going to -- we're like this
20 really is -- these are -- this is important stuff, and so
21 that falls into that bucket too.  And so that's what I'm
22 struggling with.  So you tell me why I'm wrong.
23           MR. OSBORN:  Great.  So I'll take that in reverse
24 order.  So, starting with the -- the idea that this is a
25 privacy statute, fundamentally the same as CIPA, the Wiretap

1 Act, and the Stored Communications Act, and that because
2 it's protected, the fundamentally long-recognized privacy
3 right, there is no need for something more.  That's point
4 one.
5          Point two is we have alleged something more, and
6 I'll get to that, one of which is the unjust enrichment of
7 Ancestry, which goes to your point about we really don't
8 hold companies responsible for commercializing our data that
9 we never intended to be commercialized that way.  But hold
10 that aside for a moment.
11      Let's keep it the first thing, do you need something
12 more.  I -- I've actually struggled in the case law to find
13 any case that says you need something more.  I don't see a
14 requirement of endorsement.  I don't see a requirement of
15 commercial development right privilege or it plainly says
16 you don't need commercial development beforehand.  As for
17 endorsement, it's not written in the statutory text.  I
18 haven't found it cases that --
19          THE COURT:  No, it's -- no one uses the word.
20 It's like kind of a descriptor, right.  But that's -- I
21 think that's -- I think that's what was going on in <u>Fraley</u>,
22 right, as opposed to some of the loose Judge Koh cases.
23          MR. OSBORN:  Well, <u>Fraley</u>, interestingly, did not
24 involve -- it was just statements of facts about what the
25 users on Facebook had liked.  They'd liked a pick, right.

1  It just said you like Coca Cola, whatever, and that -- the
2  republication of that fact was enough to create liability.
3  But even setting aside Fraley, there have been plenty of
4  cases that don't involve explicit endorsement, right.  All
5  of the model cases where models' photographs were stolen off
6  of websites -- that's KNB Enterprises.  That's all the
7  Perfect 10 cases.  There's three of those.  All of those
8  found liability even though there was no endorsement.
9          THE COURT:  Well, no endorsement, but there is
10 commercialization, right?  So that's -- I mean, I think
11 commercialization is another --
12         MR. OSBORN:  And there's commercialization here.
13         THE COURT:  Yeah.
14         MR. OSBORN:  There's absolutely commercialization
15 here.  To me it's directly analogous to the model cases just
16 because --
17         THE COURT:  But the models have a, you know -- I'm
18 sorry to interrupt, but when you think about, you know, the
19 Ice Cube case that I just talked about, you know, he is a
20 celebrity.  He does have a commercialization value for his
21 images that he's capitalized on.  And by, you know, taking
22 that for your own business purpose is somewhat different
23 than somebody who doesn't have that kind of
24 commercialization value in their yearbook picture.  It's
25 hard for me to say -- I see it in the celebrity context.  I

absolutely see it in the celebrity context or the model context, and you don't have to be a celebrity to be a model. I see that.

MR. OSBORN: Right.

THE COURT: It's harder for me to see it in the context of the yearbook photos.

MR. OSBORN: Right. So I'll actually switch to that. I do want to get back to Campbell and Davis, and you have the statutory injury itself is enough. I mean, there'll be something more, but I'll address the commercialization point right now.

THE COURT: It's a nice legal issue, by the way. If you don't need more, if the statutory violation is enough, you know, I could be just flat out wrong and you could be completely right, and then that -- that's -- you know, it's an interesting issue. You know, I have taken the position that in Spokeo often -- often you need something more.

MR. OSBORN: So -- so let's just talk about it then. So Campbell and Facebook are both Ninth Circuit cases. They're both analyzing Spokeo, and they're both saying like Spokeo drew a line between cases -- or statutes that create a substantive right for which the procedural violation -- or, of course, the violation of the statute itself creates standing, and those are purely procedural.

15

And Campbell and Facebook say, well, maybe with a standard and a conclusion with respect to certain statutes. The standard is -- and I'm reading from the case:

"When a statute codifies a substantive right where the harms protected bear a close relationship to ones that have been traditionally regarded as providing a basis for a lawsuit, then the violation of the statute itself creates standing."

And they apply that to privacy statutes, to CIPA, Restored Communications Act, and the Wiretap Act. Now, we had also explained in our briefing that California Section 33444 -- or 33.4, sorry, is a statutory codification between the three traditional privacy rights. It's one of four privacy rights recognized in the common law. This is from the Newcombe v. Adolf Coors Company case we cited from the Ninth Circuit, and we also gave legislative history in our briefs that would indicate that the intent of the California legislature was "was primarily to expand the scope of privacy rights to include a remedy for commercial appropriation, Prosser's fourth tort of privacy."

So, stepping through that analysis, it's really hard for me to see how the Campbell and Davis analysis doesn't apply equally to Section 33.4 as it does to the STA, the

1 Wiretap Act is --
2            THE COURT:  Yeah, if you're -- if you're right on
3 that comparison, then you win, right.  I think I 100 percent
4 agree with you.  That's your best argument, and that's --
5 that's what this case all comes down to.  That's -- that is
6 helpful.
7      So, okay.  So let me -- let me just -- I don't know if
8 you want to briefly respond from Ancestry.  I've got one
9 more case to quickly get through, and I've got to move,
10 unfortunately, on to my criminal calendar, but it's really
11 helpful.  I mean, that's -- that's -- I really do think that
12 you're right, Mr. Osborn, it all comes down to the -- you
13 know, is the statute the kind of statute where it's intended
14 to protect the right period and so the statutory violation
15 is enough to establish standing.  So I think that really is
16 -- is -- that's it.  That's the -- that's what this all
17 turns on.
18            MR. OSBORN:  Yes.
19            THE COURT:  Okay.
20            MR. MORGAN:  Yeah.  I'll respond in less than a
21 minute, your Honor.
22            THE COURT:  Great.
23            MR. MORGAN:  First, the California courts
24 themselves have interpreted this statute as requiring
25 something more, and a mere violation is not enough.  I mean,

1  the Slavinski case from the California Appellate Court said
2  resulting in injury is sin quo non of this statute.  You
3  need to show a resulting injury.  It is not enough to --
4           THE COURT:  Right.  That's the -- the actual --
5  the actual injury argument, exactly, required.
6           MR. MORGAN:  Right.  And just, your Honor, as to
7  the -- does the statute require something more?  I think
8  it's clear right in the text of the statute because in
9  3344(e), it says the mere use of the image or the likeness
10 shall not necessarily constitute a violation of the statute.
11 You know, rather, you have to look at whether the likeness
12 was "so directly connected with the commercial sponsorship
13 or with the paid advertising as to constitute a use for
14 which consent is required."
15      So they are -- I think that language encapsulates
16 exactly what your Honor was getting at, that the legislature
17 did say it's not enough just to show they used the likeness.
18 It's was it so connected with commercial sponsorship,
19 endorsement, in other words, that -- that we're going to put
20 this on the other side of the line.
21           THE COURT:  Okay.  Good.  Thank you very much.
22 I'll take the matter under submission.
23           MR. OSBORN:  Thank you.
24           MR. MORGAN:  Thank you.
25      (Proceedings adjourned at 10:31 a.m.)

18

CERTIFICATE OF TRANSCRIBER

I certify that the foregoing is a true and correct transcript, to the best of my ability, of the above pages of the official electronic sound recording provided to me by the U.S. District Court, Northern District of California, of the proceedings taken on the date and time previously stated in the above matter.

I further certify that I am neither counsel for, related to, nor employed by any of the parties to the action in which this hearing was taken; and, further, that I am not financially nor otherwise interested in the outcome of the action.

*[signature]*

Echo Reporting, Inc., Transcriber

Tuesday, June 29, 2021